IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

SAMMY L. DAVIS, SR.,

      Petitioner,

v.                        Case No. 6:07-cv-00127

DAVID BALLARD, Warden,
Mount Olive Correctional Complex[1],

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending is Respondent's Motion for Summary Judgment (# 16). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

### PROCEDURAL HISTORY AND PETITIONER'S CLAIMS FOR RELIEF

#### Petitioner's criminal proceedings and direct appeal

On May 15, 1996, Petitioner was charged by a Wood County grand jury in a thirteen count indictment with the following crimes: murder in the first degree (Count One), sexual assault in the first degree (Count Three), sexual assault of a spouse (Count Four), two counts of aiding and abetting sexual assault in the first degree

---

[1] David Ballard is now the Warden at the Mount Olive Correctional Complex. The Clerk is directed to modify the docket sheet accordingly.

(Counts Five and Six), conspiracy to commit murder in the first degree (Count Ten), and conspiracy to commit sexual assault in the first degree (Count Eleven) (Case No. 96-F-51). The other charges contained in the indictment were brought against Petitioner's co-defendants, Sammy Davis, II, who is Petitioner's son, William Tanner, and Jamia Rex Davis (a/k/a "J.J. Davis").

All of these charges arose out of events that allegedly occurred in early February, 1996. The victim was Petitioner's then-pregnant girlfriend, Rhoda Snyder, who, at the time of her death, was living with Petitioner in an apartment in Parkersburg, in Wood County, West Virginia. Ms. Snyder's body was found in a rural area of Wirt County, West Virginia, on February 8, 1996. The evidence presented at Petitioner's trial will be discussed in greater detail below.

Petitioner was represented throughout all of his criminal proceedings by attorneys, William E. Kiger and Jeffrey A. Elder, both experienced criminal trial attorneys. Petitioner's first trial, which occurred in February of 1997, ended in a mis-trial. A second trial occurred between May 27, 2007 and June 6, 2007. On June 6, 2007, Petitioner was found guilty of murder in the first degree, with a recommendation of mercy (Count One), sexual assault of a spouse (Count Four), two counts of aiding and abetting sexual assault in the second degree (Counts Five and Six), conspiracy to commit murder (Count Ten), and conspiracy to commit sexual assault

(Count Eleven).  (# 16, Ex. 4).

On September 4, 1997, Judge Reed sentenced Petitioner to life with mercy on Count One, two to ten years on Count Four, ten to twenty-five years, each, on Counts Five and Six, and one to five years, each, on Counts Ten and Eleven.  The sentence imposed on Count Ten was ordered to run concurrently with the sentence on Count One, and the sentence imposed on Count Eleven was ordered to run concurrently with the sentence on Count Four.  All other sentences were ordered to run consecutively.  (Id., Ex. 5).

On March 11, 1998, Petitioner, by counsel, filed a Petition for Appeal of his convictions and sentences to the Supreme Court of Appeals of West Virginia (the "SCAWV"), raising the following grounds for relief:

1. The Circuit Court erred as a matter of law in failing to consider the admissibility requirements of Rule 804(b)(3) hearsay statements by the accomplices.

2. The Circuit Court erred as a matter of law for failing to determine whether the out-of-court statements are admissible under the Confrontation Clause of the Sixth Amendment of the United States Constitution.

3. The Circuit Court erred for failure to grant a new trial based upon insufficient evidence.

4. The Circuit Court erred in failing to grant a change of venue.

(Id., Ex. 6).  The SCAWV accepted the Petition for Appeal on June 4, 1998.  Petitioner, by counsel, filed a brief in support of his grounds for relief on September 17, 1999.  On December 11, 1998,

3

the SCAWV affirmed the judgment of the Circuit Court.  State v. Davis, 511 S.E.2d 848 (W. Va. 1998)(not included in the record).

The SCAWV found that Petitioner had knowingly and intentionally waived his right to challenge the admission of the accomplices' statements for strategic reasons.  Id. at 852. Therefore, Petitioner could not raise such a challenge on appeal or in any other post-conviction proceeding.  The SCAWV further found that there was sufficient evidence to support Petitioner's guilt beyond a reasonable doubt, and that the trial court did not commit reversible error by denying Petitioner's motion for a change of venue.  Id. at 852-854.  Concerning the change of venue claim, the Court specifically found:

> While the record shows that the appellant's community had heard about his case, and that several members of the jury had heard of the case, the record also shows that the members of the jury indicated that they could impartially judge the appellant's guilt or innocence.
>
> * * *
>
> Overall, in reviewing the case, the Court cannot conclude that the appellant demonstrated that the jurors had such fixed opinions that they could not judge him impartially.

Id. at 854.

### Petitioner's state court habeas corpus proceedings

On November 16, 1999, Petitioner filed a pro se Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County (Davis v. McBride, Case No. 99-P-210).  (# 16, Ex. 7).  On November 19,

4

1999, the Circuit Court appointed attorney Joseph Troisi, to represent Petitioner in his habeas corpus proceedings. Petitioner, by counsel, filed an Amended Petition on September 17, 2002. (Id., Ex. 8). The Amended Petition alleged the following grounds for relief:

1.  The trial court's refusal to change venue effectively denied petitioner a fair trial.

2.  The Court's refusal to strike for cause the potential juror, Ms. Abbott, further denied the defendant a fair trial.

3.  The Court's erroneous evidentiary ruling in regard to certain knives belonging to the defendant substantially prejudiced his right to due process and to a fair trial.

4.  The Court improperly instructed the jury on the elements of the offense of Murder in the First Degree and failed to instruct the jury adequately in the elements of the offense of Murder in the Second Degree.

5.  The defendant was denied effective assistance of counsel.

    I.   Trial counsel's failure to maintain its objection to the admissibility of out of court statements of co-defendants and co-conspirators denied defendant the effective assistance of counsel.

    II.  Defense counsel's failure to object to the Court's Instructions covering the charge of Murder and its lesser included offenses constituted a denial of effective assistance of counsel.

    III. Defendant's trial counsel failed to investigate material facts, to interview available witnesses and to prepare adequately for trial.

5

IV.  Defendant's trial counsel failed to engage the services of experts on relevant and material issues to such an extent that he was denied effective assistance of counsel.

6.  The evidence presented at trial was insufficient to support verdicts of "guilty" on all charges contained in the indictment and especially on the various sexual assault charges.

7.  Defendant's trial counsel had a conflict of interest that should have disqualified him from representing the defendant.

(<u>Id.</u>) An evidentiary hearing was held on February 17, 2004. (<u>Id.</u>, Ex. 16). An "Opinion and Order" denying habeas corpus relief was entered by the Circuit Court on January 3, 2006. (<u>Id.</u>, Ex. 9).

<u>Petitioner's state habeas appeal</u>

On August 22, 2006, Petitioner, by counsel, Mr. Troisi, filed a Petition for Appeal from the denial of Petitioner's Wood County habeas corpus petition in the SCAWV, asserting the following grounds for relief:

A.  The trial court wrongly concluded that its refusal to strike a certain juror for cause did not merit relief.

B.  The trial court wrongly concluded that its admission into evidence of the defendant's knives did not warrant relief.

C.  The trial court wrongly concluded that its instructions to the jury on the elements of murder were proper and did not warrant relief.

D.  The trial court wrongly concluded that the defendant/petitioner was provided effective assistance of counsel despite the facts that his counsel failed to object to the admissibility of the extra-judicial statements of Tanner and Davis,

6

failed to object to the court's murder
instructions, failed to present favorable evidence
in its possession and failed to engage the services
of any expert.

(<u>Id.</u>, Ex. 10).  The SCAWV refused the petition on January 10, 2007.

(<u>Id.</u>)

### The instant federal habeas corpus petition

On March 1, 2007, Petitioner, proceeding <u>pro</u> <u>se</u>, filed the
instant Petition for a Writ of Habeas Corpus under 28 U.S.C. §
2254, alleging the following grounds for relief:

1.   The state trial court committed reversible trial
error as a matter of misrepresentation of both
state and federal law in failing to consider the
admissibility requirements of Rule 804(b)(3)
hearsay statements by the accomplices in this
particular case.

2.   The state trial court committed reversible trial
error as a matter of misrepresentation of both
state and federal law in failing to determine
whether the out-of-court statements made by co-
conspirators are admissible under the Confrontation
Clause of the Sixth Amendment to the United States
Constitution.

3.   The state trial court committed reversible trial
error as a matter of misapplication of both state
and federal law for failure to grant a new trial
based upon insufficient evidence.

4.   The state trial court committed reversible trial
error as a matter of misapplication of both state
and federal law for failure to grant a change of
venue in the re-trial of the case after declaring a
mis-trial.

5.   The state trial court committed reversible trial
error as a matter of misapplication of both state
and federal law in wrongfully concluding that its
refusal to strike a certain juror for cause did not
merit state post-conviction relief.

7

6.     The state trial court committed reversible trial error as a matter of misapplication of both state and federal law in wrongfully concluding that no error was committed which warranted relief in the erroneous trial and habeas evidentiary rulings in regard to the instructions to the jury on the elements of murder were proper and did not warrant relief that substantially prejudiced the petitioner's right to due process and a fair trial.

7.     The state trial court committed reversible trial error as a matter of misapplication of both state and federal law in wrongfully concluding he was provided effective assistance of trial counsel despite the facts counsel failed to object to the admissibility of the extrajudicial statements, that his counsel failed to object to the court's erroneous murder instructions, that his counsel failed to present favorable evidence in his possession and his counsel failed to engage the services of any experts, all of which substantially prejudiced the Petitioner's right to effective assistance of trial counsel, due process and a fair trial.

(# 2).

On March 13, 2007, Petitioner filed a Motion for Appointment of Counsel (# 6), asserting that he could not read or write, and that he had the assistance of other inmates in preparing his section 2254 petition and other papers.[2]  Thus, on March 16, 2007, the undersigned appointed attorney Dennis H. Curry to represent Petitioner in this matter.  At the undersigned's own initiative, Petitioner was given an opportunity to amend the petition, simply because Petitioner was then represented by counsel.  Petitioner did not move to amend the petition on his own.  The amended petition

---

[2]    The undersigned notes that the section 2254 petition was well-drafted.

8

was due by May 15, 2007.  (# 10).

On May 10, 2007, Mr. Curry filed a Motion to Extend Time to File an Amended Petition, due to the volume of the state court records.  (# 11).  The undersigned granted that motion and extended the deadline for filing an amended petition to July 16, 2007.  (# 12).

On July 16, 2007, Mr. Curry, contacted the undersigned's staff to inform the court that he would not be filing an amended petition in this matter, but would proceed on the petition as it was initially filed by the pro se Petitioner.  Thus, on July 16, 2007, the undersigned entered an order directing Respondent to file a response to Petitioner's original petition by August 17, 2007, with Petitioner's reply due September 17, 2007.  (# 13).

On July 20, 2007, Petitioner filed a letter addressed to the undersigned in which he objected to Mr. Curry's failure to file an amended petition, and reiterated the Sixth Amendment claims concerning the confrontation of witnesses, and his ineffective assistance of counsel claim related thereto, that were addressed in his original petition.  (# 14).  The undersigned assumes that Petitioner again had an inmate assist him in drafting this letter. The letter also attached other correspondence between Mr. Curry and Petitioner, which, prior to the filing of the letter that was also sent to Respondent's counsel, would have been subject to the attorney-client privilege.  (Id.)

9

On August 17, 2007, Respondent filed an Answer to Petitioner's Petition (# 15), a Motion for Summary Judgment, with voluminous exhibits (# 16), and a Memorandum of Law in support thereof (# 18).

On September 5, 2007, Mr. Curry filed a Motion to Withdraw as Counsel (# 19), asserting a breakdown in communication with Petitioner that was materially affecting his ability to continue to represent Petitioner.  For good cause shown, on September 17, 2007, the undersigned granted Mr. Curry's Motion to Withdraw, and found that Petitioner, with the assistance of another inmate, or whomever was assisting him at the prison, appeared to understand the issues before the court and the basic procedures to be followed, and that he appeared to be able to present his claims without the assistance of counsel.  Thus, no new counsel was appointed to represent Petitioner.  (# 20).  The September 17, 2007 Order also advised Petitioner, pursuant to the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of his right to respond to Respondent's Motion for Summary Judgment, and setting deadlines for the response and a reply brief.  (Id.)

On October 10, 2007, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgement (## 21, 22). Respondent did not file a reply.  This matter is ripe for determination.

## FACTUAL BACKGROUND AND TRIAL TESTIMONY

On February 8, 1996, law enforcement officers responded to a report of a body being found in rural Wirt County, West Virginia. The victim, Rhoda Snyder, was discovered by Herbert Flynn and Robert Reed, who were cutting firewood in the area.  (# 16, Ex. 13 at 517).  Upon arrival, the officers found the victim's naked body lying on a woodpile located near the road.  (Id. at 539).  Ms. Snyder had been strangled with a bra and had been stabbed.  (Id. at 578).  Her clothing was located near her body.  Her panties and one white tennis shoe were located inside her pants.  (Id. at 539, 555-556).

The officers investigating the case did not reveal any details concerning the condition of Ms. Snyder's body, or where it was located.  Thus, those details should not have been known to anyone who had not seen the body.

In the course of their investigation, the police interviewed two individuals, Sammy Lee Davis, II, who is Petitioner's son (hereinafter "Little Sammy"), and James William Tanner.  Each gave multiple statements to the police.  Although both of these men repeatedly changed their statements, and admitted to police that they had not told the truth in their prior statements, both men had knowledge of details of the crimes that were not known to the public.  Details of each statement will be discussed further infra.

11

The State's theory was that Petitioner killed Ms. Snyder to prevent her from reporting her sexual assault by Petitioner and his accomplices.   On December 9, 1996, the State filed a Notice of Intent to Use Evidence, pursuant to Rule 804 of the West Virginia Rules of Evidence.   The notice stated that the State may offer the statements of Sammy Lee Davis, II, and James William Tanner, on the grounds that they were statements of co-conspirators of Petitioner.

At pre-trial hearings conducted on January 3 and January 14, 1997, both Little Sammy and Mr. Tanner asserted their right against self-incrimination under the Fifth Amendment to the United States Constitution, and were found to be unavailable to testify at the trial.   After taking testimony from the investigating officers, the trial court, the Honorable Jeffrey B. Reed, presiding, found that the statements were voluntarily given.

Although Petitioner's counsel has raised an objection to the use of the accomplices' out-of-court statements at trial, they ultimately withdrew that objection, stating that they believed the statements may be helpful to Petitioner's case.   Specific details concerning this waiver will be discussed further <u>infra</u>.

The following information is taken from testimony and evidence presented at Petitioner's trial[3]:

---

[3] The undersigned notes that, in addition to the testimony and evidence discussed herein, there was additional testimony and evidence offered by both the prosecution and the defense; however, the undersigned does not believe such testimony and evidence to be relevant to the issues raised in Petitioner's section 2254 petition.

## Little Sammy's statements

Little Sammy gave a total of four statements; those statements were taken on February 8, 1996, February 9, 1996, February 15, 1996, and March 21, 1996.  Little Sammy was not under arrest at the time he gave these statements.  Although Little Sammy did not testify at trial, the investigating officers testified about the statements they took from him and tape recordings of three of these statements were played for the jury.

The jury was also provided a transcript of each tape to follow along as they were played.  The text of those statements is not included in the trial transcript, and only the transcript of the last statement given by Little Sammy has been included in the record before this court, as Respondent's Exhibit # 12.  (# 16, Ex. 13 at 889-900, 1024-1027, 1090-1098).

Concerning Little Sammy's statement on February 9, 1996, which was not recorded, West Virginia State Trooper Ray Holland, who took the statement, testified as follows at trial:

> Mr. Davis advised that he wasn't being truthful in his prior statements given to the police.  He advised that J.J. Davis and Rex Hudson didn't have anything to do with getting -- or disposing of Rhoda's body.  He said -- he advised that he had told the police that they did, and he lied because J.J. and Rex would tease him and he wanted revenge back on them.  He also advised that he did help his father get rid of the body because his father threatened to kill him if he didn't help him, and he believed he would do it since he had already killed Rhoda.  He also advised that he was telling the truth on

the prior statement about what happened in the apartment
and that he -- let's see -- and that he had helped his
dad dispose of the body in Wirt County.

(Id. at 1012).  On cross-examination, Trooper Holland stated that
he thought that Little Sammy was being evasive, even though he had
come there voluntarily to give a statement.  (Id. at 1015).

On February 15, 1996, Little Sammy gave another statement in
which he told investigators that he, alone, committed the sexual
assault and murder of Ms. Snyder, and that Petitioner only assisted
in disposing of the body.  Based upon that statement, the State
moved to dismiss the murder charge against Petitioner.

Then, on March 21, 1996, Little Sammy gave yet another
statement in which he told investigators that his prior statements
had not been truthful.  In this statement, Little Sammy stated that
he, Petitioner, and William Tanner each participated in the sexual
assault of Ms. Snyder, and that Petitioner cut her with a knife.

Little Sammy further stated that, after Ms. Snyder threatened
to report the sexual assault, Petitioner told her he would kill
her, and then did so by strangling her with her bra.  Little Sammy
said that both the sexual assault and murder were initiated by
Petitioner.  A transcript of that statement is located in
Respondent's Exhibit 12.  (# 16, Ex. 12).

### Mr. Tanner's statements

William Tanner gave three different statements to the police.
His statements were taken on March 7, 1996, March 19, 1996, and

14

March 20, 1996.  Two of those statements were tape recorded.  At trial, the tapes of those statements were played for the jury, and the jurors were provided with transcripts of the statements.  The text of those statements is not included in the trial transcript.  However, the transcript of Mr. Tanner's final statement, given on March 21, 1996, is included in the record before this court as Respondent's Exhibit 11.  (# 16, Ex. 11).

At trial, Sergeant William Rectenwald, a West Virginia State Trooper, testified that he and Sergeant Lewis Peck, of the Wirt County Sheriff's Department, took a voluntary statement from Mr. Tanner on March 7, 2006.  Sergeant Rectenwald testified that, after advising Mr. Tanner of his <u>Miranda</u> rights, they asked him some questions before taking a tape-recorded statement.  Sergeant Rectenwald further testified that the unrecorded portion of the interview was substantially the same as the recorded portion.  (# 16, Ex. 13 at 1032).

During that interview, Mr. Tanner apparently told the investigating officers that he had no involvement in the sexual assault or murder of Ms. Snyder, and that he only aided in the disposal of her body after those crimes occurred.  Mr. Tanner told the officers that he had burned the sheet in which the body had been wrapped.  At that time, Mr. Tanner did not mention that Ms. Snyder had been stabbed, or that she had been beaten with an aluminum bat.  (<u>Id.</u> at 1035-1037).

15

After taking the statement from Mr. Tanner, Sergeant Peck asked Mr. Tanner to describe the layout of Petitioner's apartment. Deputy Peck made a drawing of the layout based upon Mr. Tanner's representations.  (Id. at 1041-1047).  Mr. Tanner then agreed to show the officers where they had taken Ms. Snyder's body.  (Id. at 1047).  Mr. Tanner traveled with Sergeant Peck and some other officers to Wirt County and took them to the spot where Ms. Snyder's body was found.  (Id. at 1048-1052).

On March 19, 1996, Mr. Tanner came back to the police station, with members of his family, to give another statement to Sergeant Rectenwald and Sergeant Peck.  That statement was not recorded; however, Sergeant Peck made contemporaneous notes of the interview. (Id. at 1053-1054).  Sergeant Peck's notes indicate that Mr. Tanner told him:

> On this day, the subject told us that he had been staying at the Bill Wilmouth residence around the 1st of February, that he had just gotten his check, that he and Sammy Davis, II, the defendant's son, had walked to the defendant's apartment on Lincoln Avenue to drink some beer.  When they arrived there at the apartment, the defendant was there, along with Linda Gibson and a big fat guy who -- he didn't know what the name was.  Rhoda Snyder, the victim, was also there.
>
> He said he got there around 1:30 in the afternoon. He stated that the defendant and Rhoda got into an argument and that the defendant started slapping her around.  She was fighting back, slapping.  He said things finally started slowing down.  The defendant and the big fat guy went and got some beer and liquor, and they came back, and the defendant and the victim got into a fight again.  At that time, the defendant hit the victim three times open-handed.  She fell onto the bed.  Then the defendant pulled an aluminum bat out of a closet and

16

started hitting her across the thigh with it and jabbed her once in the stomach with it.

He advised us that the defendant ripped the victim's white t-shirt off during the first fight.  During the second fight, he ripped the victim's bra off and started choking her.  At that time, he advised that he and Sammy Davis, Jr., II, walked outside the apartment and stayed outside.  Shortly thereafter, the defendant came out, advised them that he'd be back, and took off walking down the alley, believing that the defendant was going to the Go-Mart, to a pay phone.

The subject said that he looked into the window of the apartment, and he saw Linda Gibson and the unknown fat guy covering Rhoda Snyder's body with a sheet.  He said about ten minutes later the defendant arrived back with his brother, J.J. Davis, or he got back and J.J. Davis came driving into the driveway in a Chevy Blazer. The defendant and J.J. Davis got together, left, came back in about twenty minutes.  Mr. Tanner then advised that the defendant opened the back of the Blazer and that the defendant went into the apartment, and shortly thereafter, the fat guy, Linda Hudson [sic; Gibson][4], and the defendant carried the body out and placed it in the rear of the Blazer.

Then he stated that the defendant grabbed him by the neck and slammed him up against the Blazer and said, "You're going with me."  The defendant then pointed to his son, Sammy Davis, II, and advised the fat man not to let him leave the area, leave the house.

Mr. Tanner advised that he got into the driver's side rear passenger area, and Linda Gibson got in the rear passenger area also.  He stated that J.J. Davis then drove the Blazer, with Sammy, Sr. up front with him. They traveled through Rockport to the Courtney Ridge area.  He said whenever they arrived there, J.J. Davis stayed in the vehicle, that Sammy Davis, Sr,. and Linda Gibson took the body out of the back of the Blazer, stood the body up, took the sheet off, and then drug the body to a brush pile.

---

[4]   Apparently, Linda Gibson was, at one time, known as Linda Hudson, and it appears that she was related by marriage to the other Hudsons who were also witnesses at Petitioner's trial.

17

The subject then stated that he saw nothing else happen to the body. He said the defendant shut the tailgate and the vehicle proceeded back out of Courtney Ridge. He said they stopped a ways down the road, and at Sammy Davis, Sr., the defendant's command, J.J. stopped, and Sammy Sr., the defendant, borrowed J.J.'s lighter, stepped out of the vehicle, and burnt the sheet which they had returned to the vehicle with.

He advised then that they proceeded through Elizabeth, the Route 14 area, back up on the interstate, and stopped at the Go-Mart on Route 50, whereby the fat man was sitting there in a van waiting on Linda Gibson. She got out and got in with the fat man to go home, and the subject stated that he rode to J.J. Davis' house, whereby J.J. and Sammy, Sr., went inside and he walked home.

(Id. at 1055-1058).

Mr. Tanner apparently requested to come back to give a taped statement the next day. In his statement given on March 20, 1996, Mr. Tanner told investigators a very similar story to the one that Little Sammy told the following day; that is, that he, Little Sammy, and Petitioner all engaged in the sexual assault of Ms. Snyder, and then Petitioner strangled her with her bra, after she threatened to report them. Mr. Tanner further stated that, Petitioner subsequently stabbed Ms. Snyder with a knife because he was afraid that she wasn't actually dead. (# 16, Ex. 11).

In this statement, Mr. Tanner again indicated that J.J. Davis arrived and helped them transport the body to the site in Wirt County where it was found. However, Mr. Tanner did not mention Linda Gibson or a "fat guy" in this statement. He implicated only himself, Little Sammy, Petitioner, and J.J. Davis in these crimes.

(Id.)   Furthermore, although Mr. Tanner again stated that Petitioner got out of the vehicle to dispose of the sheet that had been wrapped around Ms. Snyder's body, this time he did not state that the sheet was burned.  (Id.)

Based upon Little Sammy and Mr. Tanner's final statements, Petitioner was again arrested and charged with the crimes as stated in the indictment.  Little Sammy, Mr. Tanner, and J.J. Davis were also subsequently arrested and charged in the same indictment as Petitioner.

<u>Other trial testimony</u>

The State Medical Examiner testified that Ms. Snyder died of ligature strangulation.  (# 16, Ex. 13 at 591).  A large amount of semen was found in her vagina.  (Id. at 604).  However, DNA testing excluded Petitioner and his two accomplices as the donors of the semen.  (Id. at 921).  The date of Ms. Snyder's death could not be pinpointed by medical evidence; however, Dr. Sopher testified that, based upon the condition of the sperm cells in the semen located in Ms. Snyder's vagina, in his opinion, she had engaged in sexual relations within 10 hours of her death.  (Id.).

In addition to the testimony of law enforcement officials who were involved in the investigation of these crimes, the State also presented the testimony of various witnesses who resided in the apartment complex where Petitioner lived with Ms. Snyder, in an attempt to establish when the sexual assault and murder may have

occurred.

Around the time of Ms. Snyder's death, Rosetta Hudson was living in the apartment next to Petitioner with her brother, Hershel, his wife, Melanie, and their children. Hershel and Rosetta's brother, Rex, and his then-fiancee, Christina, were also temporarily staying in the apartment for about a month.

The testimony of the Hudsons established that sometime around the beginning of February of 1996, Petitioner came over to their apartment and visited for a while. Christina testified that, at some point that day, Petitioner stated that "he was going to head back over to his apartment because he was expecting Rhoda any moment." (# 16, Ex. 13 at 732). She further testified that she subsequently heard a knock at Petitioner's door and heard Petitioner say, "Well, it's about time you got here, you f-ing bitch." (Id.)

Rosetta Hudson also testified about Petitioner coming over to their apartment on either February 1st or 2nd of 1996, and she confirmed that Petitioner stated he was going home because Rhoda was supposed to be coming home. (Id. at 721-723). Both Rosetta and Melanie Hudson testified about hearing an argument coming from Petitioner's apartment. Melanie recognized two voices; that of Petitioner and Rhoda Snyder. (Id. at 706). Both Melanie and Rosetta heard Petitioner call Ms. Snyder a "whore" and other derogatory terms. (Id. at 707, 724-725). Both of them further

stated that they never saw Rhoda Snyder again after that.  (<u>Id.</u> at 708, 726).

Melanie Hudson pinpointed the date of the argument as being in early February, because it occurred after she received her public assistance check, which is on the "first of every month."  (<u>Id.</u> at 702-707).  Rosetta Hudson believed that the argument occurred on the same night that Petitioner had been visiting their apartment. (<u>Id.</u> at 724-725).

Hershel Hudson testified that he overheard a conversation or argument between Petitioner and a female, whose voice he could not recognize, during which Petitioner said, "What did you leave for, you fucking bitch?"  (<u>Id.</u> at 692).  However, Hershel testified that this conversation occurred "around the 1st or 3rd of June."  (<u>Id.</u> at 693).  He did add, however, that he did not recall seeing Ms. Snyder after that conversation her overheard.  (<u>Id.</u>)[5]  Rex Hudson did not testify at Petitioner's trial.

Melanie Hudson further testified that, a few days after she heard the argument, Petitioner came over to their apartment again and gave her husband a pair of Rhoda's boots and offered her some of Rhoda's other belongings.  Melanie Hudson stated to Petitioner that she "figured she'd be back after them," but Petitioner said

---

[5]  At the time he testified, Hershel Hudson stated that he had just driven all night from Georgia to be present for the trial, and that he was tired, which he said may have affected his memory.  (<u>Id.</u> at 689, 693).

"he doubted it."  (Id. at 709-710).

The State also called Linda Gibson as a witness.[6]  Ms. Gibson, who lived in the apartment right above Petitioner and Ms. Snyder, testified that Petitioner and Ms. Snyder frequently argued, and that Ms. Snyder often came upstairs after their fights to talk to her.  (Id. at 748-749).  Ms. Gibson further testified that, in the early part of February of 1996, while her husband was working out of town, she heard an argument coming from Petitioner's apartment. (Id. at 749).  She stated that she heard a male voice and a female voice, but could not definitively identify them as those of Petitioner and Ms. Snyder.  (Id. at 750).

Ms. Gibson stated that this argument differed from previous arguments she had overheard because "there was a lot more pounding and banging around."  (Id.)  Ms. Gibson further stated that her two children had gone to bed around 10:00 that night, and she went to bed around midnight.  (Id. at 750-751).  She further stated that, sometime in the middle of the night, she heard a car door and thought it might be her husband coming home, so she got up to look out the window.  (Id. at 751-752).  Ms. Gibson stated that she observed J.J. Davis' red and black Blazer parked outside (she knew it to be his vehicle), and she saw J.J. Davis, Sammy Davis, Sr.

---

[6]  This is the same Linda Gibson who had been implicated by William Tanner in his March 19, 1996, statement as having been present in Petitioner's apartment at the time Ms. Snyder was killed, and having helped to dispose of the body.

(Petitioner), Sammy Davis, II (Little Sammy) and "Billy" Tanner standing by the Blazer, and then they walked toward Petitioner's apartment. (Id. at 754-755).

Ms. Gibson further stated that she stepped away from the window for a moment to go to the bathroom, but when she came back, she looked out the window again and saw the four men putting something into the Blazer. She testified that it appeared to be a body wrapped in a sheet. (Id. at 756-758). The men then left in the Blazer. (Id. at 759). Ms. Gibson further testified that she never saw Ms. Snyder again after that night. (Id. at 760). Ms. Gibson did not report what she saw to anyone at that time, or for sometime thereafter.

Ms. Gibson further testified that, about a week after she witnessed these events, she went down to Petitioner's apartment to fix a radio for him, and Petitioner told her that "he had gotten rid of Rhoda and that me and him could be together." (Id. at 760-761). Ms. Gibson testified that Petitioner's comment made her nervous and scared. (Id. at 761).

After the discovery of Ms. Snyder's body, Ms. Gibson gave several statements to the police. Apparently, at first, Ms. Gibson did not tell the police about what she had seen from her window. At trial, she testified that she was not completely forthright during her first statement, because she was scared, and because she had been drinking. (Id. at 762).

23

On cross-examination, Ms. Gibson was asked about a statement she gave to a Sergeant Adkins in which she described an argument between Petitioner and Ms. Snyder during which she allegedly overheard Petitioner say, "If you leave me, I'll kill you." (Id. at 779). She also described banging and thumping that "sounded like a chair hitting a wall." (Id.) In that statement, Ms. Gibson also told Sergeant Adkins that she saw a red and black Chevy Blazer arrive on that morning, which Ms. Gibson identified to Sergeant Adkins as being January 22nd or 23rd. (Id.)

The State also presented the testimony of Sarah Shuman and Tammy Gaston, two employees of Consumer Credit Counseling Service, which was Petitioner's third party payee for his public assistance payments. Both of these women testified that, on February 1, 1996, Petitioner came into their office, with a woman whom he introduced as "his wife." (Id. at 969, 983). Both women also stated that Petitioner had never brought a woman into their office before, nor had he given any indication that he was married, so they were surprised that he introduced her that way. (Id.)

Both women also testified that, when the news stories broke that Ms. Snyder's body had been found, they both recognized her as the woman that had come into the office with Petitioner on February 1st. (Id. at 973-974, 985-986). When shown a photo lineup by police, both women also identified Ms. Snyder as the woman they had seen in their office. (Id. at 971, 984-985).

24

Rhoda Snyder's mother, Patricia Snyder, also testified for the prosecution.  She stated that she last spoke with Rhoda on either January 26th or 27th, and that Rhoda always called her at the beginning of the month, because she received Rhoda's public assistance checks for her.  Patricia Snyder further testified that she did not hear from Rhoda on February 1st, when she received her check, but that she was scheduled to go to a doctor's appointment with Rhoda on February 2nd, so that did not concern her.  (Id. at 802-803).  However, Patricia did not hear from Rhoda ever again.

On either February 2nd or February 3rd, Patricia Snyder contacted the police to report Rhoda missing.  However, she was not able to file a missing persons report until February 6, 1996.  (Id. at 805).  As previously noted, Rhoda Snyder's body was found two days later, on February 8, 1996.

In Petitioner's case in chief, Petitioner's mother, Nancy Davis, testified that she last saw Rhoda Snyder at her house on January 26, 1996, but that Rhoda called her around 5:00 a.m. the next morning, and told her that she was going to Richmond, Virginia, with a trucker, and that she would be back in three or four days.  (Id. at 1122-1123).

The defense also presented the testimony of a man named William Cross, who stated that he went with Petitioner to Consumer Credit Counseling Service on February 1, 1996, because Petitioner owed him money, and that Rhoda Snyder did not go with them.  (Id.

25

at 1187).  Mr. Cross also testified that he only went to Consumer
Credit Counseling Service with Petitioner one time.  (Id. at 1194).

Petitioner took the stand at his trial.  He testified that he
last saw Rhoda Snyder on January 26, 1996, at the apartment where
Petitioner's mother and brother were living.  (Id. at 1227).
Petitioner stated that he left for a while, and when he came back,
Rhoda was no longer there.  He stated that he went to look for her
at two or three different places before he went home, including the
home of John Stephens, stating that "she generally goes out there
all the time."  (Id. at 1228-1233).  However, Rhoda wasn't at any
of these locations and did not come home that night.  (Id.)

John Stephens also testified for the defense, stating that the
last time he saw Rhoda Snyder, she arrived at his house during the
late evening hours of January 27, 1996, with a man he did not know,
and that they were drinking.  (Id. at 1136-1137).  They arrived in
a black car that looked like a Ford Escort.  (Id. at 1136, 1138).
Subsequently, Ms. Snyder left in the car with the unknown man, and
Mr. Stephens never saw her again.  (Id. at 1143).

On cross-examination, Mr. Stephens stated that he recalled
that Ms. Snyder was wearing "black leather shoes," that he
described to be like men's "work boots" that night.  (Id. at 1146-
1147).  Patricia Snyder testified that she saw a pair of black
boots in Petitioner's apartment, both on February 6, 1996, after
Ms. Snyder had gone missing, and, again, in May of 1996, when she

went to remove Ms. Snyder's belongings from the apartment. (<u>Id.</u> at 1340-1341).

Petitioner further testified that, subsequent to January 26, 1996, he called Ms. Snyder's mother four or five times to see if she was there, but he was never able to locate her again. (<u>Id.</u> at 1233-1234). Petitioner further stated that the last time he saw her, Ms. Snyder was wearing the same clothes that were found near her body. (<u>Id.</u> at 1234-1235). Petitioner denied having anything to do with Ms. Snyder's death or sexual assault. (<u>Id.</u> at 1235-1236).

## **STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the United States Supreme Court held that under the "contrary to" clause, a

27

federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court went on to note that under the "unreasonable application" test, a federal habeas court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is

28

entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.). The United States Supreme Court has recognized the appropriateness of Rule 56 motions for summary judgment in habeas corpus proceedings. See Blackledge v. Allison, 431 U.S. 63, 80 (1977).

In the body of his motion (although not in the title), Respondent also moves to dismiss any claims in Petitioner's section 2254 petition that fail to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The undersigned has addressed the merits of each of the claims raised in Petitioner's federal petition, and has determined, in accordance with Rule 56, that Respondent is entitled to judgment as a matter of law on each of Petitioner's claims. Thus, there is no need to address Respondent's Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6).

<u>**ANALYSIS**</u>

A.   **Grounds One and Two - Admission of accomplices' out-of-court statements; Ground Eight - Ineffective assistance of counsel for failure to maintain objection to admission of statements.**

In Grounds One and Two of his federal petition, Petitioner challenges the admission of certain out-of-court statements made by his co-defendants, Sammy Davis, II, and William Tanner, which were admitted, ultimately without objection from the defense, under Rule 804(b)(3) of the West Virginia Rules of Evidence. In Ground One of

his petition, Petitioner asserts that the trial court failed to consider the admissibility requirements of Rule 804(b)(3) before admitting the hearsay statements by the accomplices.  In Ground Two of the petition, Petitioner asserts that the trial court failed to determine whether the out-of-court statements made by co-conspirators were admissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

In support of Ground One, Petitioner asserts:

On December 9, 1996, the State filed a Notice of Intent to Use Evidence, pursuant to Rule 804 of the West Virginia Rules of Evidence.  The prosecution's notice states that the State may offer the statements of Mr. Davis, II, and Mr. Tanner upon the grounds that the statements are statements of co-conspirators of the petitioner.  These accomplices then asserted their Fifth Amendment Privilege against self-incrimination and did not testify at the petitioner's jury trial.  In response to this the State moved the trial court for admission of the out of court hearsay statements by the two accomplices to the murder under the penal interest exception of Rule 804(b)(3).  The petitioner who cannot read or write through his court appointed trial counsel agreed not to contest the admission of the coconspirator statements since at that time Rule 804(b)(3) out of court statements were admissible if they subjected the declarant to criminal liability without further inquiry.  Pretrial Hearings, January 13th and 14th, 1997.  The trial court found that the accomplices were deemed unavailable to testify within Rule 804(b)(3) since each coconspirator asserted their Fifth Amendment Privilege against self-incrimination.  A decision the petitioner maintains is a violation of clearly established federal law and a violation of his Sixth Amendment Right to the United States Constitution to confront these witnesses in the presence of the jury.

* * *

Now the petitioner argues that the West Virginia Supreme Court of Appeals held that an analysis of the

30

admission of the hearsay statements of coconspirators involves two issues: (1) the admission under Rule 804(b)(3) of the West Virginia Rules of Evidence, and (2) the admission under the Confrontation Clause of the Sixth Amendment of the United States Constitution and W. Va. Const. Art, III, § 14.

* * *

However, in the petitioner's case a review of the trial record concerning the pretrial hearings on January 13th and 14th, 1997, will show that the state trial court performed no such analysis pursuant to the elements set out by the West Virginia Supreme Court of Appeals in State v. Mason, 194 W. Va. 228, 460 S.E.2d 43 concerning whether the Confrontation Clause . . . prohibits the admission of the multiple out-of-court statements made by the petitioner's codefendants in this case.

In Mason and State v. Ladd, 557 S.E.2d 820 (W. Va. 2001), quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 1592 n.14 , 71 L. Ed.2d 816, 827 n.14 (1982) the West Virginia Supreme Court of Appeals previously stated: "Plain error warrants reversal 'solely in those circumstances in which a miscarriage of justice would otherwise result.'" Also the State [sic; court] held that self-serving collateral statements and neutral collateral statements are not admissible under Rule 804(b)(3) before a trial court can reach the issue of the declarant's unavailability to testify, the circuit court must determine that all self-serving collateral and neutral collateral statements are excluded; that the statements are against the penal interest of the declarant; that the statements are trustworthy.

Therefore, when circuit courts are confronted with a Rule 804(b)(3) unavailability issue, whereby the declarant is seeking to invoke the privilege against self-incrimination, the circuit court must: (a) determine whether questions are facially self-incriminating; (b) determine whether the witness proved non-facially incriminating questions were in fact self-incriminating; and (c) determine whether the witness established unavailability.

Wherefore, the petitioner herein proffers to this Honorable Court that a review of the state trial court records will reveal that the circuit court performed no

31

such analysis.   Further, this clear error affected the petitioner's substantial rights because it affected rights guaranteed by the Confrontation Clause of the Federal and State Constitutions. [Citations omitted].

(# 2 at 6-7).   In support of Ground Two, Petitioner adds:

Each separate statement by each accomplice, Mr. Davis, II, and Mr. Tanner, conflicted with their previous statements in that each accomplice admitted to lying to investigators in previous statements.   In this instance, cross-examination for reliability would impugn reliability of the statements of the accomplices. Wherein, a thorough review of the trial court and habeas records in this case reveals that the circuit court performed no such analysis.   Thus, proving the trial court and the West Virginia Supreme Court of Appeals decisions to deny relief on this claim of clear error is a violation of both federal and state law and a misapplication of federal law.

* * *

Wherefore, the introduction of the accomplice out-of-court tape recorded statements clearly violate[d] the petitioner's rights to confront the witnesses against him.   So because this is the only evidence supporting the petitioner's convictions in this case then his convictions must be reversed as a matter of state and federal law because this inadmissible evidence was not only prejudicial to the petitioner.   It clearly affected the outcome of the trial.

(Id. at 9-10).

Respondent contends that these two claims are procedurally defaulted because Petitioner's withdrawal of an objection to the admission of the accomplices' statements resulted in Petitioner's knowing waiver of the right to raise any issues concerning the admission of those statements on appeal.   Respondent's Memorandum of Law states:

32

The trial court clearly informed the Petitioner that by waiving his objections to Tanner's March 20th statement he was waiving his right to raise the issue on appeal. <u>Supra</u> at 18. Despite this clear warning the Petitioner raised the issue in his petition for direct appeal. [FN9 - Although Petitioner argued that counsel's decision to admit these statements without objection constituted ineffective assistance of counsel, he did not raise a freestanding confrontation clause claim in his <u>pro se</u> or amended state habeas filings. (Resp't Ex. 7 and Resp't Ex. 8.) There is a substantial difference. Counsel may consent to the admission of or even elicit inadmissible evidence for tactical reasons.] (Rep't Ex. 6.) The state supreme court refused to address the issue on procedural grounds ruling that the Petitioner had knowingly and intentionally waived his objections during trial:

The Appellant's attorney in the present case specifically stated to the trial court that he did not wish to object to the admission of hearsay statements which have now been challenged by the appellant. To the contrary, he indicated that, for tactical reasons, he considered the admission of the statements at trial to be desirable.

As stated in [Syl. pt. 8,] <u>State v. Miller</u>, [459 S.E.2d 114 (W. Va. 1995),] when there has been a knowing and intentional relinquishment or abandonment of a known right at trial, even in what otherwise would be a plain error situation, inquiry as to the <u>effect of the deviation from a rule of law need not be determined on appeal</u>. In effect, the Court held that where such a waiver has occurred, the error of the event giving rise to an alleged error cannot serve as the basis for the reversal of a conviction. In light of this, this Court believes the appellant's present challenge to the hearsay statements is without merit.

<u>State v. Davis</u>, 511 S.E.2d 848, 852 (W. Va. 1998)(*per curiam*)(emphasis added).

(# 18 at 23-24). Respondent further states:

In order to exhaust state remedies, a petitioner must properly place his federal claims before the state's highest court. See, e.g., Matthews v. Evatts, 105 F.3d 907, 911 (4th Cir. 1997). In the instant case, the Petitioner failed to argue his claim before the Supreme Court of Appeals in a proper procedural context.

The exhaustion requirement does not require the prisoner to return to state court if the claims are procedurally barred in state court. Teague v. Lane, 489 U.S. 288, 297-98 (1989); Bassette v. Thompson, 915 F.2d 932, 937 (4th Cir. 1990). Instead, claims not presented to the highest state court, and which are procedurally defaulted, will be deemed exhausted. Gray v. Netherland, 518 U.S. 152, 161-62 (1996). "However, the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the Petitioner can show cause and prejudice for the default." Id. at 161. See also Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

(Id. at 24).

Respondent notes that ineffective assistance of counsel, if demonstrated, may constitute such cause and prejudice. (Id. at 25). Thus, the undersigned will also now address Petitioner's claim of ineffective assistance of counsel concerning the failure to maintain an objection to the admission of the accomplices' statements.

In Ground Eight, Petitioner asserts several claims of ineffective assistance of counsel. One of those claims is that his counsel failed to maintain an objection to the admissibility of the accomplices' out-of-court statements. The undersigned will refer to this claim as Ground Eight (a).

34

As noted previously herein, at the pre-trial hearing on January 13, 1997, Mr. Kiger stated:

> And I want to put on the record while the defendant is present and while Mr. Elder is present that our decision to not to oppose the State's use of the Tanner statement of March 20th is a strategic decision that we have made, which we think is for the defendant's benefit, and I've--
>
> THE COURT: I want to make sure --
>
> MR. KIGER: I've explained that to Mr. Davis, and he concurs and agrees.

(# 16, Ex. 15 at 5).   The court then questioned Petitioner about this decision:

> THE COURT: I just wanted to make sure that you understand the significance of what you're doing.  In other words, you're saying, you know, "State, you can go ahead and admit all this evidence, and I'm not going to object to that."  Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you're giving up your right to challenge that on appeal.  Do you understand that.
>
> THE DEFENDANT: Yeah, I guess.
>
>                       * * *
>
> THE COURT: Well, I don't want you to guess at this point, okay?  I want you to know.  And I don't care which way you decide, but I want you make sure that you understand and know, not guess, but know that if you don't challenge it here, you cannot challenge it in the Supreme Court. Do you understand that?
>
> THE DEFENDANT: Yes, sir.

(Id. at 9).  Later in the same hearing, Mr. Kiger made a similar waiver of objection to Little Sammy's statements:

35

MR. DURIG: Your Honor, the next issue that we had
intended on taking up was our notice of intention to use
the statement of Sammy Lee Davis, II, given on March
21st, 1996.

THE COURT: Okay.

MR. KIGER: Our position on that is the same as with Mr.
Tanner's statements, Your Honor, as long as all of them
are available to us to use for impeachment.

* * *

THE COURT: You're not contesting the admissibility of any
of those statements?

MR. KIGER: No, Your Honor.  We think it helps us.

(# 16, Ex. 15 at 40, 43).

The prosecuting attorney, Mr. Durig, then made the following

statement:

I don't believe that those other statements prior to
March 21st were so opposed to the declarant's penal
interests that they would in and of themselves qualify
under Rule 804 as substantive evidence.  The State does
recognize that they can be impeachment, but it would be
our position that they would be solely impeachment.

(Id. at 43).

Petitioner's federal petition states in pertinent part:

Initially, trial counsel objected to admission of
the statements and filed a memorandum in opposition.

* * *

Most significant and inexplicable, is the fact that
these statements were the SOLE evidence that the
petitioner herein sexually assaulted his girl friend
Rhoda Snyder, conspired to sexually assault her or aided
and abetted her sexual assault (two counts).  The jury
returned verdicts of "guilty" on each of those four (4)
counts and the petitioner was sentenced to not less than
22 years and not more than 60 years in state prison as a

36

result of those convictions even though the physical evidence from the victim's autopsy report and scientific DNA evidence excluded him as the rapist in this case.

* * *

Now the petitioner avers that had the out-of-court statements by Tanner and Davis, II, not been presented to the jury that would have had NO evidence upon which to convict the petitioner of the four (4) sexual offense[s] or the sole count of murder.  A motion to dismiss those counts would had to have been granted by the trial court at the close of the State's case in chief.  There is simply no way to avoid this fact.  As a consequence, the failure of trial counsel to maintain its objections was a denial of effective assistance of counsel.

Would the objection have been effective?  The petitioner was convicted on June 6, 1997, and sentenced on August 29, 1997; on April 29, 1997, the case of In the Interest of Anthony Ray Mc., 489 S.E.2d 289, was submitted to the West Virginia Supreme Court of Appeals and was decided on June 19, 1997.  The decision substantially diminished the circumstances under which out-of-court statements may be admitted into evidence under Rule 804(b)(3) and the statements of Tanner and Davis, II, would NOT be admissible under the standards set out in Anthony Ray Mc., insofar as they were inculpatory to the defendant.

This legal conclusion is inescapable in connection with those segments of the statements inculpating the petitioner in the sexual assault of Rhoda Snyder and also as to those segments inculpating him in her homicide. Had the trial court overruled trial counsel's objection to the admission into evidence of these statements and had appeal been taken on that issue then either the ruling in Anthony Ray Mc. would have had retroactive effect, or, in any event, the appeal would have been successful . . . . if petitioner's counsel would have preserved this issue for direct appeal, thereby giving him the opportunity to be acquitted by the jury and, failing that, the opportunity for a new trial upon appeal.  Thus, it cannot be emphasized too strongly that there was no reasonable basis for the decision to withdraw counsel's objection to the admissibility of these profoundly damaging statements which were the ONLY evidence that the petitioner sexually assaulted Rhoda

Snyder, conspired to sexually assault her and abetted her
sexual assault by two (2) other individuals.

(# 2 at 29-31).

As noted by Respondent, the Supreme Court addressed the right
to effective assistance of counsel in <u>Strickland v. Washington</u>, 466
U.S. 668 (1984).   In <u>Strickland</u>, the Court adopted a two-pronged
test for determining whether a defendant was provided inadequate
assistance of counsel.   The first prong is competence; Petitioner
must show that the representation fell below an objective standard
of reasonableness.   466 U.S. at 687-91.   There is a strong
presumption that the conduct of counsel was in the wide range of
what is considered reasonable professional assistance, and a
reviewing court must be highly deferential in scrutinizing the
performance of counsel.  <u>Id.</u> at 688-89.

> In order to meet the first prong, a defendant must
> identify the acts or omissions of counsel that are
> alleged not to have been the result of reasonable
> professional judgment.   The court must then determine
> whether, in light of all the circumstances, the
> identified acts or omissions were outside the wide range
> of professionally competent assistance . . . . [C]ounsel
> is strongly presumed to have rendered adequate assistance
> and made all significant decisions in the exercise of
> reasonable professional judgment.

<u>Id.</u> at 690.

The second prong is prejudice; "[Petitioner] must show that
there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been
different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Id. at 694.

Respondent asserts that Mr. Kiger's decision not to challenge the use of the accomplices's statements was reasonable. His Memorandum of Law states:

> Instead of arguing that Petitioner did not participate in the rape and murder of his pregnant girlfriend, he contended that his client was not even there the evening she was killed. (Resp't Ex. 16 at 35.) He argued that he had last seen the victim almost a week before she was raped and murdered. If he was not there when she was murdered, he could not have been there when she was raped. [Footnote omitted].
>
> Petitioner never admitted being involved, nor did he make any incriminating statements. He maintained his position when he took the stand in his own defense. His co-defendants, both of whom were already convicted, said he was there, then he wasn't, then he was there again. Counsel effectively attacked the reliability of the co-defendant[s'] statements as a means of undermining the integrity of the State's entire case.
>
> His decision fell within the bounds of objective reasonableness. Indeed, there is concrete proof of this. These very same statements were introduc[ed] at Petitioner's first trial. Counsel's trial strategy resulted in a hung jury. Given these results, it was not unreasonable to believe that his strategy had worked. To repeat trial tactics which have proven to be effective in the past cannot be said to be objectively unreasonable.

(# 18 at 27-28). Respondent emphasizes that the petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. (Id. at 25-26).

In his Response to Respondent's Motion for Summary Judgment, Petitioner argues:

[A]t the time of his trial and when he agreed on the trial record to waive his rights to confrontation of the two witnesses that he did not truly understand the ratification of the waiver and could have not knowingly and intelligently done so based upon his illiteracy, and due to the mis-advice of his State court appointed trial lawyers during the trial of this case in the Circuit Court of Wood County.

Furthermore, Petitioner proffers as the United States Supreme Court states in <u>Crawford v. Washington</u>, 541 U.S. 36, 49 (2004), "[I]t is a rule of common law, founded on natural justice, that no man shall be prejudiced by evidence which he has not the liberty to cross-examine."

(# 22 at 3).

The state habeas court found as follows on this claim:

The decision as to how to handle the multiple statements of the Petitioner's co-defendants was a classic example of trial strategy. There is a strong presumption that counsel's actions were the result of sound trial strategy and this presumption can only be rebutted by clear record evidence that the strategy adopted by counsel was unreasonable. <u>State v. LaRock</u>, 196 W. Va. 294, 470 S.E.2d 613 (1996). "In defining the required showing under the first prong of the <u>Strickland</u> analysis, the United State[s] Supreme Court cautioned that a counsel's conduct does not constitute ineffectiveness if it may be construed as the result of 'tactical decisions.' 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed.2d at 694 (Citation omitted.)"

(# 16, Ex. 9 at 13-14). The court further found:

Petitioner's argument on this issue is not convincing for two reasons. First, no analysis of either <u>State v. Mason</u>, 194 W. Va. 221, 460 S.E.2d 36 (1995) or <u>In Re: Anthony Ray Mc.</u>, 200 W. Va. 312, 489 S.E.2d 289 (1997) is made to the facts of the Petitioner's case. Neither of these cases mandate, without any factual development, a complete exclusion of the statements from the two co-defendants. Therefore, to determine what affect, if any, these two cases have on the admissibility of any statements is purely speculative. To be able to effectively argue that the decision in <u>In Re: Anthony Ray</u>

40

<u>Mc.</u> would have benefitted the Petitioner, the analysis set out in <u>In Re: Anthony Ray Mc.</u> would have to be made. This was not done in the habeas corpus proceeding.

In this same vein, if one or more of the statements made by either of the two co-defendants were deemed admissible, then the Petitioner would have to make a critical decision. That decision would be - do I just allow the jury to hear some of the statements from the co-defendants (perhaps the ones that are most credible), or do I allow the jury to hear all the statements made by the co-defendants (which would include the statements that are inconsistent with some of the physical facts)? That is of course, the decision that the Petitioner ultimately made at the trial level - to allow all the statements to be heard by the jury so that the Petitioner could then bring to the attention of the jury the inconsistencies in those various statements.

Second, and perhaps most damaging for habeas corpus relief, is that even if all of the statements of the two co-defendants were deemed inadmissible, there was still ample evidence to convict the Petitioner of the murder charge. Petitioner's argument on this topic in this habeas corpus proceeding ignores two very important facts: one is that there was a murder charge and two that there was admissible and credible evidence that linked the Petitioner to the murder of Rhoda Snider [sic: Snyder] independent of any of the co-defendant's statements.

* * *

From this evidence alone, there is sufficient evidence to establish that Petitioner was involved in the murder of Rhoda Snider [sic; Snyder]. At Petitioner's trial, the strategy was to use the conflicting and confusing statements of the co-defendants to argue that all the charges were untrue. Without these statements such a defense would not have been available. The Petitioner has not alleged in this habeas corpus proceeding what the defense theory would have been without the co-defendant[s'] statements. The Petitioner, along with his trial counsel, had a choice: attempt to keep out the co-defendant[s'] statement[s] and still have to deal with the testimony of the Hudsons and Ms. Gibson with no known viable defense to the murder charge, or admit the co-defendant[s'] statements so that they could

41

then argue the inconsistencies as a defense to both the murder charge and the sexual assault charges. This is a classic case of trial strategy.

At the time that the decision to go with this theory was made, the Petitioner was questioned about this choice. The Petitioner made this decision and is now unhappy with the outcome. However, the law does not allow the Petitioner, with the use of hindsight, to now decide that this choice was wrong.

(Id. at 15-18). The AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const., Amend. VI. This right was secured to state court defendants under the Fourteenth Amendment, as discussed in the Supreme Court's decision in Pointer v. Texas, 380 U.S. 400 (1965). In Davis v. Alaska, 415 U.S. 308, 315 (1974), the Court emphasized that the essential purpose of the Confrontation Clause "is to secure for the opponent the opportunity of cross-examination."

The Supreme Court specifically addressed the interplay between the admission of evidence under Rule 804(b)(3) of the Federal Rules of Evidence (which is equivalent to the West Virginia Rule of Evidence 804(b)(3)), and the constraints of the Confrontation Clause in Williamson v. United States, 512 U.S. 594 (1994). The SCAWV similarly addressed the admission of evidence under the same provisions in State v. Mason, 460 S.E.2d 36 (W. Va. 1995), and the West Virginia court references Williamson therein.

42

In <u>Williamson</u>, the Supreme Court first addressed how to determine whether an out-of-court statement is admissible under Rule 804(b)(3).  The Court stated:

> In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else [such as in arrest statements of a co-defendant].
>
> * * *
>
> The question under Rule 804(b)(3) is always whether the statement at issue was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all of the surrounding circumstances."

<u>Id.</u> at 603-04.  The Supreme Court in <u>Williamson</u> found that the district court did not make a sufficient inquiry as to whether the statements admitted in that case were truly self-inculpatory.  <u>Id.</u> at 604.  In light of that disposition, the Supreme Court then declined to address the defendant's Confrontation Clause claim, but noted that:

> the very fact that a statement is genuinely self-inculpatory - which our reading of Rule 804(b)(3) requires - is itself one of the "particularized guarantees of trustworthiness" that makes a statement admissible under the Confrontation Clause.  <u>See</u> <u>Lee v. Illinois</u>, 476 U.S. 530, 543-545, 106 S. Ct. 2056, 2063-2064, 90 L. Ed.2d 514 (1986).

<u>Id.</u> at 605.

In <u>Mason</u>, the SCAWV held that:

> Before the disputed statements could be admitted, the trial judge was required to analyze the defendant's objections under both the hearsay rules and under the Confrontation Clause.  If the statements are inadmissible under either of these provisions, they must be excluded.

460 S.E.2d at 42.  Petitioner asserts that the trial court did not correctly analyze the admissibility of his accomplices' statements under either Rule 804(b)(3) or the Confrontation Clause.

However, the <u>Mason</u> court further held that:

> [I]f a defendant fails to object to the admission of evidence in violation of his Confrontation Clause rights, it is ground for reversal only if it constitutes plain error.  <u>See</u> Fed. R. Crim. P and W. Va. R. Crim. P. 52(b).  "Plain error warrants reversal 'solely in those circumstances in which a miscarriage of justice would otherwise result.'" <u>State v. Miller</u>, [<u>supra</u>, 459 S.E.2d at 129].

<u>Id.</u>  As previously noted by the SCAWV in its decision denying Petitioner's direct appeal:

> when there has been a knowing and intentional relinquishment or abandonment of a known right at trial, even in what otherwise would be a plain error situation, inquiry as to the <u>effect of the deviation from a rule of law need not be determined on appeal</u>.  In effect, the Court held that where such a waiver has occurred, the error of the event giving rise to an alleged error cannot serve as the basis for the reversal of a conviction. [Citing <u>State v. Miller</u>].

This finding is in accord with United States Supreme Court precedent, holding that, in order for a waiver of a fundamental constitutional right to be effective, it must be "an intentional relinquishment or abandonment of a known right or privilege." <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938).  This was the case law that

44

governed such inquiries at the time of Petitioner's conviction.

It is clear from his Response to Respondent's Motion for Summary Judgment, and the letter Petitioner sent to the undersigned regarding his objection to Mr. Curry's decision not to file an Amended Petition, that Petitioner is also attempting to rely upon the Supreme Court's ruling in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004), in which the Court held that out-of-court statements that are "testimonial" are barred, under the Confrontation Clause, unless witnesses are unavailable, and the defendant has had a prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court.  <u>See also</u> <u>State v. Mechling</u>, 633 S.E.2d 311 (W. Va. 2006)(SCAWV's adoption of same holding).  Petitioner's claim of ineffective assistance of counsel appears to be based, in part, on Petitioner's assertion that, had Mr. Kiger objected to the admission of the accomplices' out-of-court statements, and preserved that issue for appeal, then <u>Crawford</u> would have applied to his case.

It must be noted, however, that Petitioner's judgment became final prior to the Supreme Court's ruling in <u>Crawford</u>, and the Supreme Court has also held that the <u>Crawford</u> decision is not retroactive on collateral review.  <u>See</u> <u>Whorton v. Bockting</u>, 127 S. Ct. 1173 (Feb. 28, 2007).  Thus, Petitioner can receive no habeas corpus relief based upon the <u>Crawford</u> decision.

45

It is clear from the state court records that the decision not to challenge the admission of any of the statements of Petitioner's accomplices was a strategic decision that Petitioner's counsel believed would lend support to his defense.  This court may not, in hindsight, second guess the reasonable strategy of trial counsel. Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot demonstrate that such a strategic decision constitutes ineffective assistance of counsel.

Furthermore, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot demonstrate cause and prejudice to overcome his procedural default of his claims concerning the admission of his accomplices' statements in his direct appeal.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on Grounds One, Two, and Eight (a), as stated in Petitioner's federal habeas corpus petition, were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on these grounds for relief.

### B.   Ground Three - Sufficiency of Evidence.

In Ground Three of his federal petition, Petitioner asserts that there was insufficient evidence to support his convictions. Petitioner states:

46

Now the petitioner argues in the present case, no
rational trier of fact could have found the essential
elements of first degree murder beyond a reasonable
doubt.  The statements of the State's key or star
witnesses were inherently unreliable since each had
admitted they lied in prior statements to the police.
Also, the weight of the evidence is exculpatory in
nature.  All the physical evidence preserved by the State
and the defense exculpates the petitioner from the
multiple felony charges of sexual assault in and of
itself which the State theorized as to why the petitioner
murdered the victim.  Thus, weighing all the evidence
presented, taken in a light most favorable to the State
against the standard of proof beyond a reasonable doubt,
a reasonable trie[r] of fact could not have found the
petitioner guilty of first degree murder and sexual
assault in this case. Therefore, the petitioner contends
the guilty verdicts are contrary to the evidence, are
without merit, and based upon mere suspicion or
speculation which involves a misapplication of state and
federal law even in viewing the evidence in the light
most favorable to the State.

(# 2 at 12-13).

In reviewing the sufficiency of the evidence to support a

state criminal conviction on a due process challenge in a federal

habeas proceeding, "the relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307 (1979).  (# 10 at 17).  The court does not re-try the

evidence or re-determine the credibility of the witnesses.  See

Wright v. West, 505 U.S. 277, 296 (1992); Marshall v. Lonberger,

459 U.S. 422, 434 (1983).

Respondent's Memorandum of Law disputes Petitioner's claim

that the only evidence that supports his guilt is the statements of

47

his co-defendants, which Petitioner argues should have been excluded.   Respondent asserts that "Counsel [sic; Petitioner?] misstates the importance of these statements.  Apart from them, the State introduced substantial evidence of guilt."  (# 18 at 30).  Respondent then recites the following summary of competent evidence to support Petitioner's convictions:

> The victim was found naked and strangled with her own bra, in a remote corner of Wirt County. (Resp't Ex. 13 at 516, 517, 529, 547, 577.)  The Petitioner, who lived with the victim testified that he last saw her on January 26, 1996. (Resp't Ex. 13 at 1235.)  When he last saw the victim, she had on the same clothes identified as State's exhibits 19 and 20, which were found beside her dead body.  (Resp't Ex. 13 at 1234.)  While the [Petitioner] stated that the victim had on tennis shoes the last time he saw her, John Stephens testified that he saw the victim on January 27, 1996, wearing black leather shoes, "that looked like mens work boots." (Resp't Ex. 13 at 1147.)  Ms. Snyder kept these boots inside Petitioner's apartment.

> Furthermore, State witnesses Sarah Shuman and Tammy Gaston testified that on February 1, 1996, the [Petitioner] brought the victim to Consumer Credit Counseling Service and introduced her as his wife. (Resp't Ex. 13 at 969.)  Shuman and Gaston recalled watching a television news report on February 9, 1996, where they recognized the victim as the same person whom the [Petitioner] brought with him on February 1, 1996. (Resp't Ex. 13 at 974, 986.)

> Also in contradiction to the [Petitioner's] assertion that he last saw the victim on January 26, 1996, is the testimony of Hershel Hudson, Melanie Hudson, Rosetta Hudson, Rex Hudson, and Christina Kapeck.  In early February of 1996, Hershel heard an argument where the [Petitioner] said, "What did you leave for, you fucking bitch?" (Resp't Ex. 13 at 692.)  Melanie also recalled the argument in February of 1996 coming from the [Petitioner's] apartment.  (Resp't Ex. 13 at 705.)  Melanie could recognize both the [Petitioner] and the victim's voices and said that the [Petitioner] called the

victim a whore and other epithets.  (Resp't Ex. 13 at
706, 707.)  Melanie said that when she later spoke to
[Petitioner], he stated that he doubted that the victim
would return to the apartment for her belongings.
(Resp't Ex. 13 at 710.)

Rosetta and Christina recalled that on the same day,
but before the argument in early February of 1996, that
the [Petitioner] came to their apartment.  (Resp't Ex. 13
at 721, 734.)  Both women state that the [Petitioner]
stayed a while and then announced that he must go to his
apartment because he was expecting the victim at any
moment.  (Resp't Ex. 13 at 723, 732, 737.)  When the
[Petitioner] returned to his apartment, Rosetta heard the
[Petitioner] shouting, "You are a whore." (Resp't Ex. 13
at 725.)  Christina heard the [Petitioner] say, "Well,
it's about time you got here, you f-ing bitch." (Resp't
Ex. 13 at 733.)

Linda Gibson, who lived above the [Petitioner],
heard an argument during this same time period.  (Resp't
Ex. 13 at 749.)  The next morning she saw a red and black
Blazer parked and observed J.J. Davis, the [Petitioner]
and Billy Tanner putting something into the rear of the
vehicle which was wrapped up in a sheet and appeared to
be a body.  (Resp't Ex. 13 at 757, 758.)  About a week
later, Gibson went downstairs to fix the [Petitioner's]
radio and the [Petitioner] said that he had gotten rid of
the victim and "that me and him could be together."
(Resp't Ex. 13 at 761.)  Gibson said that she had given
statements to the police, but she was scared to tell them
everything about what happened because of her children,
but did not "out and out lie" – – she just did not tell
everything she knew.  (Resp't Ex. 13 at 762.)

A sheet recovered during a search of the victim and
[Petitioner's] apartment contained a blood stain and nine
separate semen stains.  (Resp't Ex. 13 at 930.)  Two of
the semen stains tested were consistent with the co-
defendant [Sammy Lee Davis, II] and one with the
[Petitioner].  (Resp't Ex. 13 at 944.)  In addition, the
blood stain was consistent with the DNA of the
[Petitioner].  (Resp't Ex. 13 at 944.)  This directly
refutes the [Petitioner's] assertion that the only
evidence of sexual assault was exculpatory. []

Given this evidence of Petitioner's guilt, there is
no evidence of actual prejudice. [FN 13 - Since the co-

49

defendant's statements were properly admitted, this Court
may consider them as evidence contradicting Petitioner's
free-standing sufficiency of evidence claim.] A rational
trier of fact could have found, beyond a reasonable
doubt, the essential elements of Petitioner's crimes.
Thus, the [Petitioner's] conviction should be affirmed.

(Id. at 31-33).

Petitioner's Response to Respondent's Motion for Summary

Judgment asserts:

Apart from these statements which Petitioner contends are
inadmissible the Respondent attempts to undermine the
exculpatory DNA evidence disputing the codefendant's out
of court statements with innuendo by avoiding the truth.
For this serology evidence in and of itself disputes the
codefendants statements and any evidence introduced by
the State opined by Respondent as evidence of
Petitioner's guilt.

     In fact, the DNA evidence disputes all the so called
substantial evidence of guilt as it proves Petitioner
could not have participated in a sexual assault and
murder of the victim in this case.  None of Petitioner's
DNA was found on and/or inside the victim's body even
though the State proffered evidence that a large amount
of male sperm was found inside and on the victim's body,
and the trial testimony of the State's alleged expert as
contained in Ground C proves it.  As for the sheet in
question found inside Petitioner's apartment where his
girlfriend the victim also resided.  It is from a common
sheet that all parties were accessible to prior to the
victims disappearance and tragic death that easily may
have been stained with body fluid during a consensual sex
act unrelated to the crimes in this case.

                         *  *  *

Thus, for all the reasons stated above and in said
petition, his convictions should not be affirmed because
the DNA evidence in question proves he could not have
committed any of the crimes in this case he is wrongfully
convicted of.

(# 22 at 5).

50

Petitioner raised a sufficiency of evidence claim in his direct appeal. After specifically discussing much of the same evidence addressed herein, the SCAWV found that "the evidence was sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Consequently, the Court concludes that the appellant's claim that the evidence was insufficient to support the verdict is without merit." 511 S.E.2d at 852-853.

The state habeas court simply found that "there was sufficient evidence to support the verdicts reached in this case." (# 16, Ex. 9 at 22). The undersigned agrees.

Certainly the evidence contained within the co-defendant's final statements was sufficient to support Petitioner's convictions on first degree murder, sexual assault of a spouse, aiding and abetting sexual assault, and conspiracy to commit these crimes. Furthermore, the testimony of the employees of Consumer Credit Counseling Service indicates that Ms. Snyder was with Petitioner on February 1, 1996, refuting Petitioner's assertion that he never saw Ms. Snyder after January 26, 1996.

Moreover, the testimony of Petitioner's neighbors indicated that, sometime in early February, Petitioner was at their apartment and stated that he needed to go home because Ms. Snyder was arriving soon. These same neighbors testified that, later that night, they heard an argument coming from Petitioner's apartment, and, subsequently, Petitioner made statements indicating that he

had "gotten rid of" Ms. Snyder, and that she probably wouldn't be back to get her belongings.  All of this evidence could lead a reasonable juror to find that Petitioner was involved in Ms. Snyder's murder.

Thus, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that no rational trier of fact could have found Petitioner guilty of his crimes of conviction based upon the evidence presented at Petitioner's trial. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

**C.   Ground Four - Failure to grant a change of venue.**

In Ground Four of his federal petition, Petitioner asserts that the trial court "committed reversible trial error as a matter of misapplication of both state and federal law for failure to grant a change of venue in the re-trial of the case after declaring a mis-trial."  (# 2 at 15).  In support of this claim, Petitioner states:

> In the State case of <u>State v. Ginanni</u>, 174 W. Va. 580, 328 S.E.2d 187 (1985); "Of some importance in a motion for change of venue is the number of jurors who are excused for cause based on the fact that they have formed an opinion."

In the petitioner's case, of the 42 prospective jurors who were initially summoned, 11 had already formed an opinion that they could not render a fair and impartial verdict based solely on the evidence.  Of the 12 jurors seated, 6 had heard of the present or prior cases through news reports in the newspapers, television news casts, conversations, or had heard of the co-defendants' convictions. As a result of this dilemma the petitioner's defense counsel filed a renewed Motion for Change of Venue before the start of the trial.  The trial court denied the motion since a jury of 12 had been impaneled and there was no cause to transfer venue. However, the petitioner argues that he had met the definition of good cause shown for a change of venue as the phrase is used in West Virginia Constitutional Article 3, Section 14 and West Virginia Code § 62-3-13.

* * *

Therefore, it is probable that the general public knowledge and pretrial publicity concerning the earlier trial of the petitioner that resulted in a mistrial and the co-defendants trials may have contributed to prejudice against this petitioner in his retrial.

* * *

Wherein the refusal to grant relief denied the petitioner's right to a fair trial.

(Id. at 15-16).

Respondent addressed this claim as follows:

Potential jurors were excused for various reasons such as pregnancy, a prepaid vacation, economic hardship of serving on the jury due to self employment, and the unwillingness to allow a recommendation of mercy for any defendant who would be convicted of such a crime. (Resp't Ex. 13 at 30, 55, 189, 251, 281, 299, 374, 491, 396, 408, 423.)

(# 18 at 33).  Respondent then specifically discusses the potential jurors who were excused for cause and the reasons therefor.  (Id. at 34-35).  Respondent further states:

It is clear that the [Petitioner's] assertions concerning why the eleven jurors were excused is incorrect.  As discussed, jurors were excused for cause, based upon various reasons in direct contrast to the [Petitioner's] assertions.  Both the trial court and [Petitioner's] trial counsel inquired of the jury venire about their exposure to information concerning [Petitioner's] case.  None o[f] the jurors indicated that they had anything but vague recollections of media coverage.  In addition, none of the seated jurors indicated they had formed an opinion as to Petitioner's guilt or innocence that could not be set aside so they could decide the case on the evidence admitted.

The United States Supreme Court has consistently held:

> Qualified jurors need not, however, be totally ignorant of the facts and issues involved [in the case].
>
> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside impression or opinion and render a verdict based on the evidence presented in court.

Dobbert v. Florida, 432 U.S. 282, 302 (1977)(quoting Murphy v. Florida, 421 U.S. 794, 799-800 (1975))(quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).  Like the petitioner in Dobbert, the Petitioner in this case, has, "directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected." Dobbert, 432 U.S. at 303.  Again, the [Petitioner] did not include with his motion for a change of venue any copies of newspaper articles or tapes of television coverage relating to the [Petitioner's] crimes.  Instead, the [Petitioner] makes general allegations of "extensive and pervasive media coverage."

(Id. at 36-37).

Petitioner's Response adds:

[T]he reason [Petitioner] did not provide this Court with
any tangible evidence (i.e., jury questionnaires, local
newspaper articles, public opinion polls, news cast video
tapes, etc...) is based on the fact that none of his
court appointed lawyers have []ever provided him with any
of these materials to assist in providing the Courts with
the scraps of evidence in support of his claim.

                            * * *

Thus, for all the reasons stated in said petition, his
convictions should not be affirmed because he did not
receive a fair trial based on negative pretrial publicity
in this case.

(# 22 at 5-6).

In the Procedural History section of this document, the

undersigned previously noted that the SCAWV addressed this claim in

Petitioner's direct appeal and found that it lacked merit.   511

S.E.2d at 854.   Nevertheless, Petitioner again raised this claim in

his habeas corpus proceedings.   The state habeas court addressed

this claim as follows:

No new evidence on this issue was presented during this
habeas corpus proceeding.   The Petitioner, in all his
pleadings and Memoranda submitted during this habeas
corpus proceeding, does not address the fact that the
trial court's ruling on the change of venue issue was
discussed and decided in the direct appeal of the
underlying conviction. * * * Therefore, the issue of the
trial court's denial of the change of venue motion had
been previously and finally adjudicated.

     There appear to be three exceptions to the rule set
out above.   The exceptions are: if the previous decision
is clearly wrong, if there is newly discovered evidence
and if there has been a favorable change in the law.   It
could also be argued that a fourth exception exists - an
allegation of ineffective assistance of counsel when the
issue was previously adjudicated.   In the case presently

                              55

before this Court, none of these exceptions are raised or argued.  Essentially, the Petitioner argues the issue of change of venue on the merits.  The Petitioner is precluded from re-litigating the change of venue issue on the merits for the reasons stated above.  Therefore, relief is denied on the basis of the trial court's refusal to grant a change of venue motion.

(# 16, Ex. 9 at 5-6).

At the conclusion of voir dire during Petitioner's trial (thus, after 12 jurors and two alternates had been seated), Mr. Kiger renewed a motion to change venue:

> MR. KIGER:  A couple of things Your Honor.  Your Honor, as the Court file will reflect, some time in the past we filed both a petition for change of venue and a motion for change of venue in this case.  It's never been ruled on by the Court, and it was, I think, perhaps a gentlemen's agreement or whatever you want to call it, that we would wait and see if we could successfully select a jury.  Notwithstanding that we now have twelve jurors and two alternates, I still am asking the Court to rule on that petition or motion or both, and my statement to the Court at this time would be that when we began these proceedings yesterday, twenty-one of the first twenty-two jurors called to be questioned indicated that they had some prior knowledge or information about this case.
>
> As the record will show, we have done individual voir dire of those twenty-two plus several more, and I think it's apparent that all of the jurors, with maybe one exception, when they came here to serve as jurors in this case, have previous knowledge or previous information about this case which came from newspapers, the television, perhaps some radio, and from talking to other people.
>
> With those things in mind, I would ask the Court to rule on our petition for change of venue and grant it based on the evidence that we've heard yesterday and today.

(# 16, Ex. 13 at 441-442).  The trial court denied the motion,

finding:

>     The record speaks for itself in terms of what the
> various jurors said during the voir dire, but it is the
> Court's recollection and interpretation that information
> that -- while most of the jurors had heard or read and
> gathered some information about this case outside of the
> courtroom, I think there were only maybe one or two that
> really had any specific recollection, and most of the
> information was very general in nature, and most of it
> was very nonspecific.  It was just that they had heard
> about it.  And most of it or at least -- yeah, I'd say
> most.  Most of the information, according to the jurors,
> was from when the body was found, which was back in
> February of 1996, or at least that was their recollection
> of when they had seen the information.

>     In addition, I don't believe there was any juror who
> ended up being on the twenty-two from which this jury was
> chosen that had any hostile sentiment against the
> defendant.  I think that's the second part of the change
> of venue test, which is, one, pretrial publicity, but
> there must be a present hostile sentiment against the
> defendant.  * * * is there present hostile sentiment
> towards the defendant.  I don't remember anybody having
> any hostile sentiment against the defendant.  There may
> have been one or two, and if there was, that person's not
> on the twenty-two that the jury was selected from.  So
> the Court would deny the petition and/or motion,
> whichever way it's styled, or if it's styled both ways,
> both of them.

(Id. at 443-444).

Under the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed a trial by an unbiased jury.  Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 551 (1976); Murphy v. Florida, 421 U.S. 794, 799 (1975).  A change of venue is required as a matter of constitutional law only when the jury pool is tainted, "by so huge a wave of public passion" that the impaneling of an impartial jury is impossible.  Mu'min v. Pruett, 125 F.3d 192, 199

(4th Cir. 1997)(citing <u>Irvin v. Dowd</u>, 366 U.S. 717, 728 (1961)).

Based upon a review of the entire record, which confirms Respondent's position concerning the scope of voir dire, the undersigned is satisfied that the jury pool in the instant case was not tainted by "so huge a wave of public passion" that the impaneling of an impartial jury was not possible. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

### D. **Ground Five - Failure to strike juror for cause.**

In Ground Five of his federal petition, Petitioner alleges that the trial court "committed reversible trial error as a matter of misapplication of both state and federal law in wrongfully concluding that its refusal to strike a certain juror for cause did not merit state post-conviction relief." (# 2 at 17). In support of this claim, Petitioner states:

> During voir dire, a prospective juror, Ms. Abbott acknowledged that she was related to a local law enforcement officer (Dale Fluharty) and a friend of another (Greg Waybright) and, in addition, that she had read an account of the case in a local newspaper. During individual questioning she elaborated that she could recall from the news article: "That it was a father and son that was involved." (See Trial Transcript at Pg. 431).
>
> In follow up questioning by defense counsel the prospective juror was asked whether she believed that

58

"the father and son were involved?"  To which she responded: "I know that's what I read, and maybe I do believe that, yes."

Counsel then asked: "Do you think that's probably what happened?"  Then, Ms. Abbott responded: "Yes."

The following exchange then took place:

Mr. Kiger: As you sit there right now, do you have a feeling about, you know, what you think probably happened here in this case?

Juror Abbott: Yes.

Mr. Kiger: Is that feeling favorable or unfavorable to Mr. Davis here?

Juror Abbott: It would be unfavorable.

Mr. Kiger then asks the potential juror if she were the defendant, but still knew everything she was feeling and thinking about this case, would she want herself as a juror.  Ms. Abbott plainly and simply answered "No." And when asked why that is so she forthrightly declared: "I just believe that he and his son were involved."

(Id.)

Petitioner then asserts that the prosecutor and the court asked Ms. Abbott questions that enabled her to rehabilitate herself and contend that she could set aside her feelings and render a verdict solely on the evidence presented at the trial.  (Id.) Thus, the court refused to grant Petitioner's motion to strike Ms. Abbott for cause.  (Id.; see also, # 16, Ex. 13 at 436-437). Specifically, the trial court stated:

Yeah.  In fact, if I'm not mistaken, she, in essence, volunteered the fact that she felt she could put it out of her mind and give both sides a fair trial and understood and accepts the proposition that Mr. Davis is an innocent man as he sits here.  So I'm not going to

59

strike Ms. Abbott.

(# 16, Ex. 13 at 437).  Ultimately, a peremptory challenge was used to remove Ms. Abbott from the jury panel, and she did not sit on Petitioner's jury.  (Id. at 438).

As noted by Respondent, the Supreme Court has held that the failure to remove a juror for cause, with the result that the defendant had to use a peremptory challenge to remove the potential juror, does not violate the defendant's right to an impartial jury. United States v. Martinez-Salazar, 528 U.S. 304 (2000); see also Ross v. Oklahoma, 487 U.S. 81 (1988).  (# 18 at 37).  In his Response, Petitioner concedes that he had not raised a cognizable claim for relief on this basis.  (# 22 at 6).

Because Ms. Abbott was removed from the jury panel by a peremptory challenge, Petitioner cannot demonstrate a violation of his constitutional rights based upon this claim.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

**E.   Ground Six - Improper admission of knives.**

In Ground Six of his federal petition, Petitioner alleges that the trial court improperly admitted into evidence two knives that belonged to Petitioner, and that the admission of the knives

60

"substantially prejudiced his right to due process and a fair trial." (# 2 at 20).  In support of this claim, Petitioner states in pertinent part:

> [I]n the State's opening statements to the jury, the prosecuting attorney informed the jury the victim, Rhoda Snyder's corpse exhibited several stab wounds on her neck.  The State further indicated that at least one of those thrusts had gone through the bra found around her and which was the instrument used in her strangulation. It was also noted that these stab wounds were post-mortem.  The jurors were also told that they would hear from Dr. Irvin Sopher, Chief Medical Examiner of the State of West Virginia, who was described by the State's attorney as "one of the persons I believe you will be impressed by." (Trial Transcript Pg. 481) And that Dr. Sopher would testify that he found four (4) puncture wounds "consistent to being stabbed with a knife in Rhoda's throat." (Trial Transcript Pg. 482).
>
> Dr. Sopher went on to even describe[] the source of those wounds as "...a weapon skin length, meaning a width of a knife, somewhere in the range of about three-eighths of an inch to a half inch and even up to three-quarters of an inch." (Trial Transcript Pg. 591).
>
> He further testified that one (1) of the four (4) stab wounds actually went through the brassiere. Moreover, he found upon subsequent internal examination that these stab wounds entered several inches into the body and that one, in fact, involved the spinal cord. (Trial Transcript Pg. 592).  Dr. Sopher later explained this to mean that the knife wound "actually penetrated into the neck and through the vertebral column, meaning your neck backbones, you know your neck bones, and actually ended up with damage to the spinal cord.  That wound penetrated about two inches deep, resulting in damage to the spinal cord." (Trial Transcript Pg. 594).

(Id.)  Petitioner adds:

> Subsequently, during the State's rebuttal examination of Sgt. William Rectenwald by the State's attorney, testimony was adduced from the State Police Trooper's seizure of a knife in a sheath worn in plain sight by the petitioner and an additional smaller knife

the defendant had in his pocket when questioned by this
police officer. (Trial Transcript Pg. 1322-23). The
knives were submitted to CIB for examination which turned
up nothing and no evidence of any kind was ever offered
that connected either knife with the wounds on the
decedent's corpse or with any of the crimes charged in
this case.

(Id. at 21).

In addition to the testimony of Dr. Sopher and Sergeant
Rectenwald, the jury heard the statements of Petitioner's alleged
accomplices, which described Petitioner stabbing Ms. Snyder with
his knife after all three of them had sexually assaulted her, and
after Petitioner had strangled her with her bra. Petitioner's
petition asserts that, because the DNA evidence from the semen
found inside Ms. Snyder's body excluded Petitioner and his alleged
accomplices as the depositors of the semen, and the fact that there
was no evidence to connect the specific knives seized from
Petitioner to the crimes involving Ms. Snyder, "the court should
not have allowed the knives into evidence because the State only
wanted to use the knives to inflame the minds and hearts of the
jury." (Id. at 20-21).

The State argued that, while Petitioner was on the stand, he
denied owning a knife in a sheath. From a review of the trial
transcript, it appears that Petitioner simply did not understand
what a "sheath" was. Nevertheless, the State called Sergeant
Rectenwald as a rebuttal witness in order to impeach Petitioner's
testimony, and the knives were introduced as exhibits during his

62

testimony.  Petitioner's federal petition adds:

> Wherein, the petitioner's defense counsel noted
> that, at best, the State's exhibits constituted
> impeachment on a collateral matter.  In fact, this is
> true only with respect to the knife worn in a sheath and
> not to Exhibit 61, the knife which the defendant took
> from his pocket and delivered to Sgt. Rectenwald upon his
> request.  In admitting both knives into evidence, the
> trial court reasoned that it did not "...see any
> prejudicial effect, since there's been testimony that he
> had the knives." (Trial Transcript Pg. 1326).
>
> * * *
>
> Now the petitioner contends these exhibits were
> introduced, in fact, as substantive evidence and not
> simply for purposes of impeachment.  No limiting
> instruction was even given by the trial court in spite of
> the fact that the petitioner's defense counsel argued
> that their only relevance was in impeaching the
> defendant's testimony on a collateral issue.  Thus, the
> court's ruling to admit the knives into evidence is
> erroneous and, in the context of all the circumstances
> surrounding their introduction and admission into
> evidence, substantially prejudiced the petitioner's right
> to due process and to a fair trial.

(Id. at 21-22).

Respondent's Memorandum of Law states:

> Prior to the introduction of this evidence the
> Petitioner testified that he carried a pocket knife with
> a six inch blade. (Resp't Ex. 13 at 1261.)  He also
> testified that he bought a hunting knife after Ms. Snyder
> disappeared.  He then testified that the knife was at
> police headquarters. (Resp't Ex. 13 at 1265.)  He also
> claimed that he didn't know what a sheath was.  After
> counsel described one, the Petition[er] denied owning a
> knife with a sheath.  (Id.)
>
> Introduction of the knife recovered by Trooper
> Rectenwald did not impeach the Petitioner on a collateral
> matter.  He denied having a knife in a sheath, in a case
> in which the victim was stabbed four times.  These stab
> wounds penetrated into Ms. Snyder's neck and through her
> vertebral column, damaging her spinal cord.  Although the

63

> wound was only two inches deep, the knife used to inflict
> these wounds would have had to pass through bone.
> (Resp't Ex. 13 at 594.)  Only a sturdy knife, perhaps a
> sheathed hunting knife, could have done this.
>
> Such a knife was recovered by Trooper Rectenwald on
> February 8.  On cross-examination the Petitioner denied
> owning a sheathed knife.  It is Petitioner's denial that
> renders the evidence probative.  The admission of the
> evidence did not render his trial fundamentally unfair.

(# 18 at 40-41).

The state habeas court found that "the admission of the knives

at the trial of this matter does not rise to the level of

justifying any relief in this habeas corpus proceeding."  (# 16,

Ex. 9 at 11).  The court noted that Petitioner did not complain at

trial, nor is he now complaining, about the admission of testimony

concerning the knives, but rather, he is only complaining about the

admission of the knives themselves.  (Id. at 10).  The Court

stated, "the admission of the knives was appropriate given that the

victim had knife wounds on her, the unclear and confusing

description of the knives possessed by the Petitioner and the

statement that the knives Petitioner possessed were now in the

possession of the State Police."  (Id.)

Because this claim involves a matter of state evidentiary law,

Petitioner must demonstrate that the admission of this evidence

impugned the fundamental fairness of Petitioner's trial or

infringed upon a specific constitutional protection; otherwise, the

claim is not cognizable in federal habeas corpus.  See Grundler v.

North Carolina, 283 F.2d 798, 802 (4th Cir. 1960).  Respondent

argues that Petitioner has not raised a cognizable claim concerning the admission of the knives at his trial.  (<u>Id.</u> at 40).   In his Response, Petitioner concedes that this claim is not cognizable.

The undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

### F.    Ground Seven - Instructional error.

In Ground Seven of his federal petition, Petitioner alleges that the state courts erroneously concluded that "the instructions to the jury on the elements of murder were proper and did not warrant relief [, which] substantially prejudiced the petitioner's right to due process and a fair trial." (# 2 at 24).   The federal petition states:

> Now the petitioner herein does not assert error in the trial court's initial paragraph advising the jury of the meaning of an intentional, deliberate and premeditated killing, which is identical to the new instruction approved in [<u>State v. Guthrie</u>, 461 S.E.2d 165 (W. Va. 1995)] (at 182-183) and quoted directly from note 7 of [<u>State v. Hatfield</u>, 286 S.E.2d 402 (W. Va. 1982)](at 410) which, in turn, quoted directly from *Federal Jury Practice and Instructions*, by Devitt and Blackmar. Rather, the problems arise in nearly everything that follows in the trial court's jury instructions as to Murder in the First Degree and in the trial court's failure to instruct the jury as to Murder in the Second Degree beyond the single sentence that it is also committed "when any person unlawfully and maliciously, but without deliberation or premeditation, kills another

person."

(Id.)  Petitioner adds, "[t]he jury instructions became a patchwork of several different legal principles [concerning the explanation of premeditation and deliberation] gathered from several distinct decisions which were neither clearly delineated nor put in proper context.  Thus resulted in a charge that was misleading and which failed to distinguish adequately between first and second degree murder."  (Id.)

Respondent asserts that the trial court's instructions were in conformity with state law.  (# 18 at 42).  Respondent states:

> The trial court instructed the jury that the Petitioner
> must have reflected on his intention to kill after he
> formed it.  See [Guthrie, 461 S.E.2d] at 181.  The court
> distinguished between premeditation and deliberation,
> telling the jury that to premeditate means that a
> defendant had thought about what he was going to do and
> "formed . . . a plan of destruction."
>
> Even if this instruction was incorrect, the
> Petitioner has not demonstrated how he was prejudiced.
> His theory of the case involved identity.  The evidence
> at trial suggested a long argument between the two
> parties, followed by Ms. Snyder's death after the
> Petitioner and his co-defendants repeatedly raped her.
> Petitioner's motive was to keep her quiet.  He then tried
> to conceal his crime.  Her body was left in a remote area
> of Wirt County, covered with leaves and brush.
> Petitioner never claimed that he acted out of the heat of
> passion, nor is there any evidence to support such a
> finding.
>
> If there was error, it was harmless.  Incorrect jury
> instructions are subject to a harmless error analysis.
> See Neder v. United States,527 U.S. 1, 8-9 (1999).  In
> habeas proceedings, an error is harmful only if it "'had
> substantial and injurious effect or influence in
> determining the jury's verdict.'" Brecht v. Abrahamson,
> 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed.2d

353 (1993)(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed.2d 1557 (1946)). For the aforementioned reasons, the error, if any, was harmless.

(<u>Id.</u> at 42-43).

Petitioner's Response does not contain any additional arguments on this claim. (# 22 at 6).

The state habeas court made the following findings on this claim:

This is a legal issue - there are no facts in dispute concerning the giving of the jury instructions and there was no evidence presented during this habeas corpus proceeding concerning this issue. This Court is of the opinion that the jury instructions given were proper and that the trial record accurately reflects all that occurred concerning the jury instructions. Therefore, no relief in habeas corpus is appropriate.

(# 16, Ex. 9 at 11-12).

Claims regarding jury instructions do not state a federal claim absent a showing that an instruction "by itself so infected the entire trial that the resulting conviction violates due process." <u>Cupp v. Naughten</u>, 414 U.S. 141 (1973). "[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n.6 (1983)); <u>Grundler</u>, 283 F.2d at 802 ("[I]nstructions to the jury in state trial are matters of state law and procedure not involving federal constitutional issues.")

The undersigned has reviewed the instructions given to the jury and finds that, if any error occurred, it was harmless under the circumstances, and that there was no violation of Petitioner's due process rights as a result of the jury instructions.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

**G.   Ground Eight- Ineffective assistance of counsel.**

In addition to Ground Eight (a) concerning Mr. Kiger's decision not to oppose the admission of the accomplices' statements, which was previously addressed, in Ground Eight of his federal petition, Petitioner alleges other claims of ineffective assistance of counsel.   Specifically, he alleges (b) that his counsel failed to object to the court's erroneous murder instructions, (c) that his counsel failed to present favorable evidence in his possession,  and (d) that his counsel failed to engage the services of any experts, all of which he asserts substantially prejudiced his rights to due process and a fair trial. (# 2 at 29).  The undersigned will now address these claims of ineffective assistance of counsel, using the Strickland standard identified above.

68

<u>Failure to object to jury instructions</u>

Petitioner alleges that his counsel's failure to object to the trial court's instructions concerning first degree murder and its lesser-included offenses constituted ineffective assistance of counsel. (# 2 at 33). Petitioner maintains that "his likelihood of prosecuting an effective appeal or habeas petition would've been substantially enhanced had his trial counsel preserved the issue by objecting to the erroneous and confusing instructions." (<u>Id.</u>) Petitioner further contends that his counsel's failure to object to the instructions "was NOT a strategic decision but a result of lack of preparation." (<u>Id.</u>)

Petitioner's federal petition further states:

> The trial and habeas record indicates that trial counsel made no objections whatsoever to the court's instructions and gave no reason for this conduct. In addition, counsel's failure in this regard underscores the unreasonableness of his withdrawal of objections to the admission of the codefendants' statements. It has been shown that the only possible tactical or strategic basis for this withdrawal would have been that the statements somehow advanced a defense to the charge of First Degree Murder; it may have opened the opportunity to argue that the homicide was committed in the heat of passion and without reflection, yet counsel's failure to object to the instructions given by the court and to offer instructions that clarified this distinction between First and Second Degree Murder effectively nullified this opportunity. Indeed, trial counsel's closing statements made no effort to advance a defense to First Degree Murder on this basis, demonstrating further that there was no reasonable tactical or strategic rationale for withdrawing objection to admission of those statements.

(<u>Id.</u> at 34).

Respondent did not address Petitioner's remaining claims of ineffective assistance of counsel in his Memorandum of Law in support of his Motion for Summary Judgment. (# 18).

Petitioner's Response notes that, other than the claim concerning the admission of the accomplices' statements, Respondent did not address his other claims of ineffective assistance of counsel in his Motion for Summary Judgment or Memorandum of Law in support thereof. Accordingly, Petitioner contends that he is entitled to judgment as a matter of law on those claims. Petitioner generally asserts that his trial counsel's mis-advice constituted ineffective assistance of counsel and "had it not been for counsel's poor performance the outcome of this case would have been different." (# 22 at 6).

Concerning Petitioner's claim that his counsel was ineffective for failing to object to the jury instructions, the state habeas court, having previously found no actionable error in the jury instructions, found that "it was not ineffective assistance of counsel to fail to object to the jury instructions." (# 16, Ex. 9 at 19). The undersigned agrees.

Because Petitioner cannot demonstrate any prejudice from the jury instructions given, he cannot meet the prejudice prong under Strickland to show ineffective assistance of counsel because he failed to object to the instructions. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state

courts' denial of habeas corpus relief on this claim were neither
contrary to, nor an unreasonable application of, clearly
established federal law, and that Respondent is entitled to
judgment as a matter of law on this claim, notwithstanding his
failure to specifically address this claim in his Motion or
Memorandum of Law.

### Failure to present evidence favorable to defense

Petitioner also alleges that his trial counsel failed to
present favorable evidence that was in his possession at the time
of Petitioner's trial.  Petitioner further states:

> During the trial, counsel failed to question State
> Police Sgt. Barry Max Henry with respect to the
> defendant's response upon first being informed that his
> girl friend Rhoda Snyder had been killed, despite the
> fact that such testimony would have been beneficial to
> the petitioner and counsel was aware of the prospective
> testimony.  During a pretrial hearing on January 13 and
> 14, 1997, the State's attorney questioned Sgt. [H]enry
> concerning his meeting with [t]he defendant at the State
> Police office on February 8, 1996, the same day on which
> the body of Ms. Snyder was found.  On direct examination,
> Sgt. Henry was asked about his professional observations
> of the petitioner's demeanor and he testified as follows:
> ["] I don't know how to accurately describe it.  He
> appeared concerned about the investigation.  He appeared
> concerned.  Initially, when we interviewed him, I don't
> think he realized that she was dead.  When he first -- I
> remember when we told him that she was dead, I remember
> that he briefly cried, or not really cried, just -- I
> don't know how to describe it.  (Transcript of Hearing
> January 13 and 14, 199[7], at Pg. 58). [# 16, Ex. 15 at
> 58.]
>
> Trial counsel understood the significance of this
> observation as demonstrated by his own testimony at the
> evidentiary hearing on the habeas petition.  (See
> Transcript of Evidentiary Hearing, February 17, 2004, at
> Pgs. 40-43). [# 16, Ex. 16 at 40-43].  Indeed, trial

counsel testified that he wanted to get that testimony before the jury but was not permitted to do so.

Also upon thorough review of the trial transcript and the transcripts of all pretrial and post-trial hearings as closely as possible, although Sgt. Henry testified at the trials and was cross-examined, defense counsel never asked Sgt. Henry about his observations of the petitioner upon first being told that the victim was dead. Nor does the record[] contain any motion by the State or any court order respecting the admissibility of such testimony. The record supports only one conclusion; trial counsel failed to elicit this favorable testimony from the state trooper who was closely involved with the investigation.

(# 2 at 34-35).

During the omnibus hearing, Mr. Kiger was questioned about his recollection of this evidence:

Q.   And am I correct that that's one of the -- that the trooper's description of the Defendant's reaction upon first learning of -- or first being told that Rhoda was dead is partly one of the things that has always caused you some disquiet about whether he might have been involved actually?

A.   Uh-huh (yes). I think if I remember correctly, Sgt. Henry and this is Max Henry, testified about this encounter with Mr. Davis, the Petitioner here today, more than once, or it may have been just in a conversation I had with him. But somewhere along the way he said that he thought Mr. Davis' reaction when he was informed of Ms. Snyder's death was that he was surprised. I don't know if that's exactly what he said, but it was to that effect. We definitely wanted the jury to be aware of that, you know, Sgt. Henry's impression, and, of course, I think we also developed that Sgt. Henry at the time was a certified polygraph operator, so he had more than just -- I believe he was, more than just your average or basic State Trooper training. It seems to me that Mr. Durig, or whoever represented the State, strongly objected or objected to us getting into that very much in the presence of the jury. That's my recollection.

72

* * *

Q.    And the only question I would have then, is it your
      recollection that you attempted to have that
      testimony presented to a jury, but were thwarted by
      the Court in doing so, as opposed to not making the
      attempt to get that testimony before the jury at
      trial?

A.    I don't know who thwarted us, but I know we tried,
      because I thought that was a significant bit of
      evidence that a trained police officer in observing
      Mr. Davis, the Petitioner here, thought that he was
      surprised when he found out the lady was dead.  I
      thought that meant something.   I don't remember
      exactly how it came out in front of the people on
      the jury, but I think we did our best to get that
      across.

(# 16, Ex. 16 at 42-43).

     At the pre-trial hearing on January 13, 1997, Sgt. Barry Max
Henry was called to testify by the State.  He was asked about his
interview of Petitioner on February 8, 1996.  A tape recording of
that interview was introduced at the pre-trial hearing; however,
neither the audio tape or a transcript has been provided to this
court.

     As noted by Petitioner in his federal petition, and as noted
in the omnibus hearing transcript, Sgt. Henry testified that, upon
learning that Ms. Snyder's body had been found, Petitioner reacted
as though he did not realize that she was dead.  (# 16, Ex. 15 at
58-59).  In addition to the quote previously cited, Sgt. Henry
testified that Petitioner showed "[l]ike a two second emotional
burst.  That was the only emotion that he showed." (Id.)

Although there was further discussion and argument on the record as to the voluntariness of Petitioner's statement to Sgt. Henry and how it may be used at the trial, there was no discussion at this pre-trial conference concerning Sgt. Henry's observations of Petitioner's demeanor, and certainly no motion to exclude such testimony. (Id. at 59-68).

Sgt. Henry also interviewed Petitioner's son, Little Sammy. At Petitioner's trial, Sgt. Henry testified. However, he was only questioned about his interview of Little Sammy; he was not asked any questions at all about his interview or meeting with Petitioner. (# 16, Ex. 13 at 1020-1029). From a review of the pre-trial and trial transcripts, the undersigned has not been able to locate any motion to exclude Sgt. Henry's testimony concerning Petitioner's demeanor or any other discussion of such evidence anywhere else in the record.

The state habeas court found as follows on this claim:

> The last issue related to the testimony of Sgt. Max Henry of the West Virginia State Police. At a pre-trial hearing, Sgt. Henry testified to the effect that at Sgt. Henry's first interview with the Petitioner, when the Petitioner was told that the victim (the Petitioner's current girlfriend) was dead, that the Petitioner reacted as if he was unaware of her death. The Petitioner now claims that the failure of trial counsel to elicit this testimony before the jury was ineffective. The State responds with several arguments as to how the failure to elicit this testimony is not ineffective: that such testimony by Sgt. Henry would have been beyond the scope of direct and therefore inadmissible; that if a police officer could testify that they think a defendant was telling the truth on an issue, could they then also testify if they think that a defendant is lying on an

74

issue; that this statement from the Petitioner was made during an interview that was not admitted and therefore the jury would have been confused; and that this testimony could easily have been explained in a manner that was consistent wit the State's theory.

While each of these arguments by the State has some merit, this Court is of the opinion that even if this testimony would have been presented to the jury, that given the weight of all the other evidence presented before the jury (specifically the testimony of the Hudsons and Linda Gibson set out above), that it would not have made any difference in the outcome of the trial.

(# 16, Ex. 9 at 21).

The record demonstrates that the State chose not to introduce or address Petitioner's interview with Sgt. Henry.  He was only questioned about his interview of Little Sammy.  Thus, it would have been beyond the scope of the direct examination for Mr. Kiger or Mr. Elder to question Sgt. Henry about Petitioner's demeanor during an interview that was not part of the evidence before the jury.  While Petitioner's counsel could have called Sgt. Henry in their case in chief to ask him about Petitioner's interview, the undersigned agrees that, given the overwhelming evidence of guilt presented at trial, there is not a reasonable probability that such testimony would have made a difference in the outcome of the trial.

Absent a finding of unreasonableness, the strategic choices of counsel are not subject to review for ineffective assistance of counsel.  The undersigned proposes that the presiding District Judge **FIND** that Petitioner's counsels' performance was not objectively unreasonable under the circumstances and, thus,

Petitioner has not demonstrated that his counsels' conduct was constitutionally ineffective. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

<u>Failure to call expert witnesses</u>

Petitioner's final claim of ineffective assistance of counsel raised in his federal petition contends that his trial counsel was ineffective by failing to call any expert witnesses "on relevant and material issues." (# 2 at 35). The undersigned has already discussed some of the findings made by Chief Medical Examiner, Dr. Irvin Sopher, during Ms. Snyder's autopsy. Petitioner's federal petition makes further note of specific findings and inconsistencies between the physical evidence and testimony, including:

> The condition of Ms. Snyder's body was not consistent with the violence described in the statements of Tanner and Davis, II., (the petitioner's codefendants); the condition of her body was not consistent with three (3) successive sexual assaults. Thus, expert testimony to assist the jury in appreciating the implication and significance of those facts to a jury was reasonable and necessary to the defense of the accused, particularly where the defense "strategy" was to allow the incriminating statements without objection.

* * *

76

The petitioner was convicted of sexual assault of a spouse, two (2) counts of aiding and abetting sexual assault and conspiracy to commit sexual assault, in the face of undisputed physical evidence that (1) Ms. Snyder's body did not exhibit vaginal or genital injury or trauma; (2) the condition of her body was inconsistent with the description of her sexual and physical assault contained in the statements of Tanner and Davis, II.; and (3) spermatozoa in her vagina was conclusively determined NOT to have been from the petitioner or these codefendants, in spite of testimony that each of them ejaculated during their sexual assaults of the victim. The codefendants' statements further demonstrate that they truly understood the meaning of the word "ejaculate."

So what evidence was presented to establish the sexual assaults of the victim? Exclusively the out-of-court statements of Tanner and Davis, II., - and the "expert" opinion of Dr. Sopher that in HALF of cases of sexual assault the victim's body does not show genital or vaginal injury and in HALF of cases of sexual assault the perpetrator does not ejaculate. Retention by the defense of an independent expert to address the probability that THREE (3) men could forcibly assault a woman and successively engage in sexual intercourse with her, without ANY of them ejaculating, without leaving any pubic hair, and without inflicting ANY signs of genital or vaginal injury, was reasonable and necessary and would have made clear the overwhelming probative value of the physical evidence. No reasonable lawyer would reasonably have done otherwise. Again, trial counsel's testimony at the petitioner's habeas corpus evidentiary hearing is telling: (See Transcript of Evidentiary Hearing at Pgs. 44-45). [# 16, Ex. 16 at 44-45].

* * *

As a result of trial counsel's failure to attempt to retain an expert on the significance of the condition of the victim's corpse and the significance of the exculpatory DNA evidence, the ONLY witness who testified on these critical scientific issues is Dr. Sopher, who made a point to present such evidence in a light most favorable to the State and most detrimental to the petitioner even though all of the physical evidence excluded the petitioner of any involvement in the sexual assaults and murder of Ms. Snyder, and, which dis-

corroborated the codefendants['] statements.

(# 2 at 36-38).  Petitioner further contends:

> The simple fact is that trial counsel, having
> asserted that the statements actually helped the
> petitioner, nevertheless failed to call an expert to
> challenge the truth of the codefendants['] inculpatory
> declarations in connection with the sexual assault
> charges and therefore, allowed Dr. Sopher's "expert"
> testimony for the State to stand unchallenged.  This
> amounts to denial of effective assistance of trial
> counsel, for no reasonable lawyer would reasonably have
> so acted.

* * *

> Finally, the date of Rhoda Snyder's death was a very
> critical issue of fact and trial counsel's failure to
> call an expert forensic pathologist for the defense
> constitutes ineffective assistance of counsel.

* * *

> Additionally, the failure of petitioner's trial
> counsel to present independent expert testimony from a
> forensic pathologist on these issues of when Ms. Snyder
> died and to challenge and to test the State's theory
> based on contradictory, confusing and vague testimony,
> denied the petitioner effective assistance of counsel.
> Even if one argues that no single error of failure on the
> part of trial counsel rises to a level of ineffective
> assistance (although the law and facts mitigate against
> such a conclusion) the cumulative effect of these errors
> and failures clearly resulted in ineffective assistance
> pursuant to the Strickland standard of review.

(Id. at 38-42).

In Wiggins v. Smith, 539 U.S. 510, 521-522 (2003), the Supreme

Court emphasized that "[i]n any ineffectiveness case, a particular

decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments."  Furthermore, in the American

78

Bar Association's "Standards for Criminal Justice," which serve as a guide for assessing reasonable conduct, Standard 4-5.2, concerning "Control and Direction of the Case," states as follows:

> (b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate.  Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

ABA Standards for Criminal Justice, Standard 4-5.2.

At the omnibus hearing, Mr. Kiger was asked about their decision not to engage any expert witnesses to testify in Petitioner's case.  He responded:

> A.   My recollection is that the report generated by Dr. Sopher was very detailed, and that if you take the content of that report in reference to the condition of the corpse and put it against the scenario about, you know, the sexual assault, the beating, and so forth given by Mr. Tanner and Mr. Davis, Jr. [sic; II], that report was almost entirely favorable to Mr. Davis, the Petitioner here today, and I didn't see -- I probably didn't even think about getting another expert to look at it, because I'm not sure we could have ended up with much better than we had there.
>
> Q.   Okay.
>
> A.   Most of that was kind of common sense stuff that people on a jury, I thought, could understand, and they didn't need, you know, somebody else telling them what they could figure out for themselves.

(# 16, Ex. 16 at 52-53).

The state habeas court found as follows on this issue:

> As for the issue of expert witnesses, [Coleman v. Painter, 600 S.E.2d 304 (W. Va. 2004)] is directly

79

applicable.   The Petitioner raises several issues with regard to the use of expert witnesses in his <u>Amended Petition</u> and <u>Memorandum of Law</u> - no signs of trauma to the victim's body, no signs of trauma to the genitalia, examination of the sheet, matching of the stab wounds to the knives, and time of death.  However, no evidence was presented on any of these issues during the habeas corpus proceeding.  Therefore, there is no evidence that the use of an expert would have been favorable to the Petitioner. As stated in <u>Coleman</u>, the Petitioner failed to prove that he suffered any prejudice because an expert witness did not testify for the Petitioner at trial.

(# 16, Ex. 9 at 20-21).

Mr. Kiger made a tactical decision that the information needed to support Petitioner's theory of the case could be derived from Dr. Sopher and his report.  This was reasonable trial strategy. Furthermore, based upon a review of the evidence as a whole, the undersigned agrees that, Petitioner has not demonstrated how the testimony of another expert witness would have altered the outcome of his trial.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not met the burden required under <u>Strickland</u> to demonstrate that his counsel was ineffective in failing to offer any additional expert witness testimony. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief as to this claim of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

<u>**RECOMMENDATION**</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 16) and **DENY AS MOOT** Respondent's Motion to Dismiss, contained therein.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the district court and a waiver of appellate review by the circuit court of appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.

1984).  Copies of such objections shall be served on the opposing

party, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and

Recommendation and to mail a copy of the same to Petitioner and

counsel of record.

        February 26, 2008                Mary E. Stanley
              Date                    Mary E. Stanley
                                      United States Magistrate Judge